# United States Court of Appeals
## For the First Circuit

Nos. 05-1301
     05-1472

MARTA DÍAZ-FONSECA,
on her own behalf and on behalf of her minor daughter;
LYSSETTE CARDONA-DÍAZ, Minor,
Plaintiffs, Appellees,

v.

COMMONWEALTH OF PUERTO RICO; DEPARTMENT OF EDUCATION
OF THE COMMONWEALTH OF PUERTO RICO;
CÉSAR REY-HERNÁNDEZ, in his personal capacity and as Secretary of
Education of the Commonwealth of Puerto Rico;
NITZA RÍOS-MALAVÉ, in her personal capacity and as Supervisor of
the Special Education Program of Cidra School District,
Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Circuit Judge,
Hansen,* Senior Circuit Judge,
and Lynch, Circuit Judge.

Doraliz E. Ortiz-de-León, Assistant Solicitor General,
Commonwealth of Puerto Rico, with whom Salvador Antonetti-Stutts,
Solicitor General of Puerto Rico, and Mariana D. Negrón-Vargas and
Maite D. Oronoz-Rodríguez, Deputy Solicitors General, were on
brief, for appellants.
     Kevin G. Little on brief for appellees.

June 16, 2006

_____
    *    Of the Eighth Circuit, sitting by designation.

**LYNCH**, <u>Circuit Judge</u>. A parent, Marta Díaz-Fonseca, brought suit in 2002 against the Commonwealth of Puerto Rico, its Department of Education, and two individual defendants, alleging that her child, Lyssette Cardona-Díaz, had been deprived of a free and appropriate public education ("FAPE") under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 <u>et seq.</u>; section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134; and Puerto Rico law.

The underlying dispute concerns whether the public schools are required to provide Lyssette, a child whom the parties agree is disabled within the meaning of the IDEA, with adaptive physical education in the form of swim classes under an Individualized Education Program (IEP), <u>see</u> 20 U.S.C. § 1414(d). The dispute led to a jury verdict and an award of compensatory damages in the amount of $45,000 to Díaz and $3000 to Lyssette against all of the defendants. The jury also assessed a total of $100,000 in punitive damages against the two individual defendants, César Rey-Hernández and Nitza Ríos-Malavé, in their personal capacities. Those two individuals respectively hold the offices of Secretary of Education of the Commonwealth and Supervisor of the Special Education Program of Cidra School District. The district court also entered broad declaratory and injunctive relief in favor of plaintiffs.

We vacate most of the relief granted, leaving intact only the award of reimbursement for the sum of private school tuition and costs for transportation and psychological services incurred by plaintiffs during the 2003-2004, 2004-2005, and 2005-2006 school years.

This case demonstrates significant confusion about the governing law in cases alleging denial of FAPE, including confusion over the limitations on monetary relief available, the limitations on suits against school administrators in their personal capacities, and the scope of immunity available to the Commonwealth in federal court. Unfortunately, as a result of counsel for plaintiffs' lack of candor about the law to the district court and defense counsel's failures to comply with court orders and to make appropriate objections on defendants' behalf, the case comes to us in a posture in which a jury has awarded damages not available in IDEA and Rehabilitation Act actions.

In order to clarify, we outline the core holdings of this case:

1. Where the essence of the claim is one stated under the IDEA for denial of FAPE, no greater remedies than those authorized under the IDEA are made available by recasting the claim as one brought under 42 U.S.C. § 1983, Title II of the ADA, or section 504 of the Rehabilitation Act.

2.   No punitive damages may be awarded in such a suit, regardless of which of the causes of action listed above is invoked.

3.   No general compensatory damages may be awarded in such a suit, regardless of which of the causes of action listed above is invoked.

4. Monetary recovery in such suits is limited to compensatory education and equitable remedies that involve the payment of money, such as reimbursements for educational expenses that would have been borne by defendants in the first instance had they properly developed and implemented an IEP.   Under the category of "reimbursement," parents may recover only actual, not anticipated, expenditures for private tuition and related services.

5.   No claim for monetary relief is stated in such cases against individual school administrators who are sued in their personal capacities.

6.   A state, here the Commonwealth of Puerto Rico, may waive Eleventh Amendment immunity from monetary liability as to IDEA and Rehabilitation Act claims in federal court by accepting federal funds.   This does not mean that the state has waived its immunity as to pendent state law claims being heard in federal court.   Here, although the Commonwealth waived its immunity from suit in federal court on the federal claims, it did not waive its immunity from suit in federal court on the pendent state law claims under Law 51,

see P.R. Laws Ann. tit. 18, §§ 1351-1359, and Puerto Rico's general negligence statute, see P.R. Laws Ann. tit. 31, §§ 5141-5142.

Applying these principles, we conclude that the harm to the public interest requires that we reverse and vacate the entirety of the punitive damages award and all compensatory damages against Rey and Ríos in their personal capacities. We also vacate those portions of the compensatory damages award against the Commonwealth that are not available as monetary relief.

Frustrated with the defendants' many defalcations in this case, the district court also granted in full plaintiffs' belated request for injunctive and declaratory relief. We reverse and vacate the entirety of the declaratory and injunctive relief awarded.

I.

There is no reason to detail the many facts and procedural events in this case and every reason to avoid a focus on the irrelevant. The crux of the dispute is that while the parties agreed that Lyssette could not engage in ordinary physical education and thus needed adaptive physical education, they could not agree over what type of adaptive physical education was appropriate. The public schools lacked swimming pools and declined to pay for swim lessons. Díaz insisted that her daughter needed such lessons and that the schools should have to pay for them, as well as for transportation to and from school and for the

-6-

psychiatric treatment Lyssette required after she became depressed because she could not engage in physical education with her classmates. Feeling frustrated that Lyssette was not receiving any adaptive physical education and that the defendants had engaged in a classic bureaucratic runaround, Díaz unilaterally removed Lyssette from public school in 2003 and placed her in a private school.

At the time the litigation began in September 2002, Lyssette was an eleven-year-old public school student. She had been diagnosed in February 2001 with spina bifida and Klippel-Feil Syndrome, as a result of which she suffers from certain physical limitations, such as a circumscribed range of motion in the neck and cervical spine. In August 2001, after a physician recommended that Lyssette refrain from further participation in traditional physical education classes, Díaz registered Lyssette in the special education program administered by the DOE[1] and requested that Lyssette be provided with specially designed physical education services. See 34 C.F.R. § 300.307(a) ("Physical education services, specially designed if necessary, must be made available to every child with a disability receiving FAPE.").

---

[1] In Puerto Rico, it is the Commonwealth's DOE that is responsible for the education of students. See P.R. Laws Ann. tit. 3, § 143a et seq.; see also P.R. Laws Ann. tit. 18, § 1356(b)(2)(B) (stating that the DOE is to "[p]rovide the education services in the public system adapted to persons with disabilities").

On September 4, 2001, the DOE convened a meeting with Díaz and other members of Lyssette's IEP team, see id. § 300.16 (defining "IEP team" as "a group of individuals . . . that is responsible for developing, reviewing, or revising an IEP for a child with a disability"); see also id. § 300.344 (specifying the composition of IEP teams), to produce an IEP for Lyssette. Their deliberations resulted in an IEP for the 2001-2002 school year; this IEP did not provide for special physical education services -- specifically, swim classes, which, plaintiffs have maintained, was the only sport Lyssette could safely practice.[2] The DOE told Díaz that it could not provide swim instruction because it did not have any schools equipped with a pool, and that Díaz would have to pay out-of-pocket for private swim lessons elsewhere.

Díaz filed an administrative complaint with the Commonwealth's DOE on November 27, 2001, requesting that it provide Lyssette with publicly funded swim classes. An administrative law judge (ALJ) eventually found that the DOE did not have the obligation to offer Lyssette swim lessons, because it was not clear from the IEP that swimming was the most appropriate physical education alternative for Lyssette. The ALJ did, however, order that Lyssette receive physical education at the same frequency as

_____

[2]    One of Lyssette's doctors had prescribed "[a]dapted physical education swimming type," and had ordered that Lyssette refrain from participating in contact sports or "any activity that could cause trauma to the neck."

her non-disabled classmates, and further directed the parties to meet again to determine, with the help of a specialist, whether swimming was the most appropriate physical education alternative for Lyssette. That order was not handed down until June 14, 2002, far beyond the forty-five days provided by the regulations for resolution of an administrative complaint. See 34 C.F.R. § 300.511(a)(1) ("The public agency shall ensure that not later than 45 days after the receipt of a request for a hearing . . . [a] final decision is reached in the hearing . . . .").

Several unsuccessful attempts to convene an IEP meeting followed; each meeting was cancelled by someone from the school or the DOE. In the end, Lyssette did not receive a revised IEP for her sixth-grade year, which was the 2002-2003 school year; rather, with Díaz's permission, Lyssette spent time with her Spanish teacher while her classmates were in physical education class.

In May 2003, the IEP team convened to create a revised IEP for the 2003-2004 school year. At that meeting, co-defendant Ríos told Díaz that she had been instructed to inform Díaz that they were not going to develop a new IEP for Lyssette. Díaz testified that Ríos refused to take minutes of the meeting and that Ríos and the other school personnel present abruptly ended the meeting when Díaz attempted to record the proceedings. No revised IEP was produced and agreed upon by the IEP team for the 2003-2004 school year.

Lyssette graduated from sixth grade in June 2003, which meant that she had to transfer to a middle school. In July of that year, Díaz met with DOE and school officials to discuss Lyssette's placement options for the following year. Díaz requested that her daughter be enrolled in the Dejas School, because of that school's proximity to Lyssette's grandmother's house and the Puerto Rican Medical Center, where Lyssette's neurosurgeon and orthopedic surgeon practiced. The DOE, however, notified Díaz that the school of her choice was not available; that the normal placement procedures for regular-education students applied to Lyssette; and that under those procedures, Lyssette could not enroll in the Dejas School, but instead must choose from two schools closer in proximity to her home. The topic of physical education was not raised during this meeting and was not mentioned as a criterion for Díaz's choice of schools.

Díaz then informed the DOE that its proffered options were not acceptable and that she would be withdrawing Lyssette from public school and placing her in private school during the 2003-2004 school year at public cost. Lyssette was eventually enrolled in a private school close to her grandmother's home; that school was equipped with a swimming pool, but, according to Díaz, Lyssette did not take swim lessons there because physical education was not a part of the regular curriculum and extracurricular lessons were prohibitively expensive.

-10-

The DOE initiated a second administrative proceeding in July 2003, challenging Lyssette's placement in the private school. That proceeding was resolved in the DOE's favor on December 10, 2003, which was apparently also in excess of the forty-five-day deadline imposed by the regulations.

In the interim, Díaz filed this suit on September 4, 2002 in federal court on behalf of herself and her daughter, alleging that Lyssette's "IEP was administered inadequately, untimely[,] and contrary to law," and that Díaz was deprived of her rights to parental involvement and to a timely, fair, and impartial due process hearing. Plaintiffs named as defendants the Commonwealth and the DOE ("the Commonwealth defendants"), as well as Rey and Ríos ("the individual defendants"), who were sued both in their personal capacities and in their official capacities as Secretary of Education of the Commonwealth and Supervisor of the Special Education Program of the Cidra School District, respectively.[3] In their initial complaint, plaintiffs asserted against all defendants claims under the IDEA, section 504 of the Rehabilitation Act, Title II of the ADA, and Puerto Rico law.

Defendants answered with a number of affirmative defenses, including that "[f]ederal policy precludes money damages

---

[3] Ríos was not named in the original complaint; plaintiffs were granted leave to amend their complaint to add her as a defendant, in her personal and official capacities, on February 6, 2004.

-11-

for IDEA claims" and that "[t]he Eleventh Amendment bars [plaintiffs'] claims." They also filed a motion to dismiss, arguing that the Commonwealth defendants had Eleventh Amendment immunity against the federal law claims, that the federal statutes did not provide for individual liability, and that the district court should decline to exercise supplemental jurisdiction over the state law claims. The district court partially granted the motion on December 16, 2003, dismissing the ADA claim for money damages against all defendants and the Rehabilitation Act claim against Rey (then the only individual defendant) in his personal capacity. Plaintiffs did not appeal these rulings.

Plaintiffs subsequently amended their complaint. They dropped their ADA claim, kept their claims under the IDEA and Puerto Rico law against all defendants, and reasserted a Rehabilitation Act claim against the Commonwealth defendants only. They sought declaratory relief under 28 U.S.C. §§ 2201 and 2202; economic and non-economic damages; compensatory and special damages, including damages for "pain and suffering, emotional distress, humiliation, and the cost of appropriate remedial services, including educational services"; punitive damages; litigation costs and fees; and "other and further relief at law or in equity" as the court deemed proper.

As the suit progressed, defendants took a lackadaisical approach to responding to their discovery obligations and various

-12-

court orders.  In particular, the DOE repeatedly failed to comply with the court's orders to produce the full record from the prior administrative proceedings.  Plaintiffs moved to sanction defendants.  In due course, the court did sanction defendants by striking their pleadings and entering a default order against them, and it did not relent when defendants sought to remove the default.

It is important to be clear about the nature of the default order.  The court said that "[t]his case is going to be tried on default, but it is not the typical default."  Indeed, unlike other defaults, the court's default order did not result in entry of a liability judgment with only damages to be determined.  Rather, the court allowed the case to go to the jury on liability and damages, and permitted plaintiffs to present evidence of both.[4]  Furthermore, the court precluded defendants from introducing any evidence, but did give them some leeway to cross-examine plaintiffs' witnesses and did allow them to make opening and closing statements.

The case was tried to a jury over the course of three days beginning October 28, 2004.[5] Testifying on plaintiffs' behalf were Díaz and Lyssette, as well as Marlene Aponte Cabrera, a former

---

[4]     The parties' briefs consistently mischaracterize the jury trial as being limited to the issue of damages.  That characterization is belied by the record.

[5]     Defendants retained new counsel the day before jury selection.

DOE ALJ, and María del Carmen Warren-González, the head of a committee of parents involved in an unrelated class-action suit against the DOE. Defendants made opening and closing statements and cross-examined plaintiffs' witnesses.

At the close of plaintiffs' case, defendants moved for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(a). They made a number of arguments, including that the default was incorrectly entered against them, that there was insufficient evidence that the IEP was inadequate, and that the individual defendants were entitled to qualified immunity. The motion was denied.

At defendants' request, before closing statements, the court talked to the jury about the default order. It explained to the jury that it had entered a "default" against defendants as a sanction against them for failing to produce evidence as ordered, which meant that defendants were "preclu[ded] from presenting any evidence in the case." This sanction, the court said, had "nothing to do with the merits of the case" and should not be taken against defendants; rather, the case should be decided "solely upon the evidence received here in Court and upon the instructions that I give you, not upon the default that was previously entered."

After closing statements, defendants did not object that as a matter of law punitive damages were not available under the IDEA and the Rehabilitation Act, that compensatory relief did not

include many of the categories of damages plaintiffs sought, and that no federal cause of action was available in a personal capacity against the individual defendants. The court relied on plaintiffs' representations to the contrary and instructed the jury that punitive and compensatory damages were available against all defendants. The court explained to the jury that compensatory damages "are damages designed . . . to put [a person] in the position [he] would have been [in] had no harm . . . taken place," and it gave the example of damages for repairs, lost wages, and medical expenses that would be available in a suit based on injuries from a car accident. It then contrasted compensatory damages with punitive damages, which "are designed to . . . punish an actor when [he has] acted with deliberate indifference toward[] the rights of another." The court also instructed the jury on the elements of causes of action under the IDEA, the Rehabilitation Act, § 1983, Title II of the ADA, and the Commonwealth law of negligence.

Defendants objected to these instructions only on three grounds:[6] (1) that an instruction regarding expert testimony was improper; (2) that compensatory damages were not available under

---

[6] At this time, defendants also raised an objection, not argued in their previous Rule 50(a) motion, that the Rehabilitation Act claim should be dismissed because "the accommodation under that law has nothing to do with the accommodation that is claimed under [the] IDEA," and thus the only legal claim available was one under the IDEA.

the state law claim, because Puerto Rico's Law 51, P.R. Laws Ann. tit. 18, §§ 1351-1359, did not explicitly allow for damages; and (3) that because the amended complaint requested damages "in an amount to be proved at trial," and this was a default trial, the only damages available were the $44,000 of economic damages testified to by Díaz. Defendants also made one objection to the verdict form: that it was unclear from the form and the court's instructions that the jury need not award punitive damages against both of the individual defendants. The court rejected all of these arguments.

The jury returned a verdict in favor of plaintiffs. It assessed compensatory damages against all of the defendants in the amount of $45,000 to Díaz and $3000 to Lyssette. The jury also assessed a $100,000 punitive damages award in favor of Lyssette, which was understood to be against the individual defendants in their personal capacities.[7]

Judgment was entered on November 9, 2004. On November 24, defendants filed a timely motion renewing their request for judgment as a matter of law, see Fed. R. Civ. P. 50(b), and requesting, in the alternative, a new trial or remittitur, see Fed.

_____

[7] The jury verdict form did not specify whether the compensatory and punitive damages were assessed against the individual defendants in their personal or official capacities; however, the amended complaint specified that the individuals were "sued in their official capacities for purposes of declaratory, injunctive and ancillary relief and in their personal capacities for purposes of monetary relief."

-16-

R. Civ. P. 59. In support of their motion, defendants raised a panoply of arguments, some of which had not been articulated after their initial pleadings were struck by the district court and before the jury verdict. In addition to challenging the sufficiency of the evidence supporting the jury verdict, defendants argued that as a matter of law, none of the statutes pleaded by plaintiffs provided for punitive damages or for the type of compensatory relief plaintiffs sought and were awarded. Defendants also argued that these statutes did not allow the individual defendants to be sued in their personal capacities, and reiterated their argument, presented in their Rule 50(a) motion, that Rey and Ríos were protected by qualified immunity. The district court denied defendants' motion, without explanation of reasons, on January 3, 2005.

Meanwhile, on November 23, 2004, plaintiffs filed a motion for declaratory relief, which defendants duly opposed. The court summarily granted plaintiffs' motion in its entirety on January 3, 2005 and summarily rejected on February 7, 2005 defendants' subsequent motion to amend the declaratory judgment order.

II.

Challenge to Entry of Default

Defendants argue the district court abused its discretion when it refused to set aside the default order against them.[8]  On plaintiffs' motion, the court had entered default against the DOE, pursuant to Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure, because it repeatedly failed to produce a full and accurate copy of the administrative record, as required by the IDEA, see 20 U.S.C. § 1415(i)(2)(C)(i) (providing that "[i]n any [civil] action brought under this paragraph, the court . . . shall receive the records of the administrative proceedings"), and by the court's discovery orders.  See Fed. R. Civ. P. 37(b)(2)(C) ("If a party . . . fails to obey an order to provide or permit discovery, . . . the court . . . may make . . . [a]n order striking out pleadings . . . or rendering a judgment by default against the disobedient party[.]").  In the same order, the court also entered default against the individual defendants on the ground that they failed to comply with discovery rules and other discovery orders.

On appeal, the Commonwealth defendants argue that their failure to provide the administrative record is not a proper ground

_____

[8]    Plaintiffs argue that the default order is not properly before this court on appeal because defendants failed to specify in their notice of appeal that they were contesting the default order. See Fed. R. App. P. 3(c)(1)(B) (requiring the notice of appeal to "designate the judgment, order, or part thereof being appealed"). Because we uphold the default order, we need not reach this issue.

for default, because the obligation to produce the record is created not by the discovery rules, but by the IDEA, see 20 U.S.C. § 1415(i)(2)(C)(i), which does not itself specify a timeline for compliance. The Commonwealth defendants also downplay the untimeliness of their responses to the various discovery orders, assert that they did not act in bad faith, note that they did eventually produce the administrative record that was sought in discovery, and decry default as excessively harsh given the circumstances. Finally, the individual defendants argue that, at the very least, sanctions should not have been imposed against them, because the IDEA imposes the obligation to produce administrative records on the DOE, not on them, and because they were timely in responding to plaintiffs' discovery requests.

"We review the trial court's imposition and selection of sanctions under [Rule 37(b)] for abuse of discretion . . . ." Guex v. Allmerica Fin. Life Ins. & Annuity Co., 146 F.3d 40, 41 (1st Cir. 1998) (per curiam); see also KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 12 (1st Cir. 2003). "There is nothing in [Rule 37(b)] that states or suggests that [any particular sanction] can be used only after all the other sanctions have been considered or tried." Damiani v. R.I. Hosp., 704 F.2d 12, 15 (1st Cir. 1983). Therefore, the sanctioned party "bears a heavy burden of demonstrating that the trial judge was clearly not justified in entering an order of [default] under Rule 37." Spiller v. U.S.V.

Labs., Inc., 842 F.2d 535, 537 (1st Cir. 1988); see also KPS & Assocs., Inc., 318 F.3d at 13 (noting that "the district court, familiar with the parties and circumstances, is best situated to weigh the reasons for and against" default (quoting Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 938 (1st Cir. 1985)) (internal quotation mark omitted)).

Although the question is close, we uphold the entry of sanctions against all defendants. The Commonwealth defendants' argument that the IDEA does not specify a schedule for the delivery of the administrative record misses the point. What matters is that the district court twice ordered them to produce the record by a certain date and that they failed both times to come into full compliance with the court's order. As to their argument that they did not act in bad faith, Rule 37(b)(2) allows for sanctions "[i]f a party . . . fails to obey an order to provide or permit discovery," and nothing in the rule requires that the failure be on account of bad faith.

All of the defendants violated discovery orders either by missing clearly established deadlines or by representing to the court that they had complied fully with their obligations, even when their submissions (timely or otherwise) were incomplete, vague, or evasive. The court's discovery orders of March 11 and April 27, 2004 explicitly warned defendants that failure to comply fully and on time would result in sanctions, including the striking

-20-

of pleadings and the entry of default. Under these circumstances, the district court was within its discretion in imposing sanctions.[9]

## III.

### Challenge to the Award of Monetary Relief

At trial, the jury found defendants liable and assessed compensatory damages against all defendants and punitive damages against the individual defendants in their personal capacities. Defendants initially challenged the availability of these damages in their post-trial motion for judgment as a matter of law, new trial, or remittitur, which the district court summarily denied. We would usually review the denial of a Rule 50(b) motion de novo and the denial of a Rule 59 motion for abuse of discretion. In this case, however, defendants failed to raise many of the

---

[9] Defendants also argue that "[i]t was an abuse of discretion for the [court] to have imposed sanctions on [them] for what were, at worst inadvertent discovery violations, while failing to even address the fact that [p]laintiffs had clearly not complied with Local Rule 26(b)." See D.P.R. R. 26(b) ("The judicial officer shall not consider any discovery motion that is not accompanied by a certification that the moving party has made a reasonable and good-faith effort to reach an agreement with opposing counsel on the matters set forth in the motion."). Defendants never invoked this rule in their motion for reconsideration of the default order, and thus the argument is forfeited. In any case, "[w]e generally will not disturb the district court's departure from its local rules so long as there is sound reason for the departure and no party's substantial rights have been unfairly jeopardized." García-Goyco v. Law Envtl. Consultants, Inc., 428 F.3d 14, 19-20 (1st Cir. 2005). Here, both the plaintiffs and the court gave defendants multiple opportunities to comply with outstanding discovery orders, as well as notice that sanctions would be imposed if compliance did not occur.

arguments raised in their post-trial motions after their pleadings had been struck and before the jury verdict. We thus review their unpreserved arguments for plain error.[10] See Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the [jury] instructions affecting substantial rights that has not been preserved as required by Rule 51(d)(1)(A) or (B).").[11]

A.      Punitive Damages

Although the claims under the Rehabilitation Act against the individual defendants and the claims under Title II of the ADA against all the defendants had been dismissed from the case before trial and no claim under 42 U.S.C. § 1983 had ever been pleaded, purported claims under these statutes were somehow used as a basis for a punitive damages instruction.[12]

---

[10]    Plaintiffs argue that a Rule 59 motion is not available to a party against whom a default judgment was entered. Whatever the merits of this argument in an ordinary default scenario, the district court made clear that this case does not involve a run-of-the-mill default judgment entered pursuant to Rule 55 of the Federal Rules of Civil Procedure.

[11]    Defendants' challenge on appeal focuses on the unavailability of the damages awards as a matter of law. We do not understand them to be raising any objection as to the sufficiency of the evidence in support of the jury verdict. To the extent that they do raise such an argument, it is waived for lack of appellate development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[12]    By the time this case went to trial, the only surviving claims against the individual defendants were those under the IDEA and Puerto Rico law. Although plaintiffs' original complaint pleaded a Rehabilitation Act claim, after the district court

-22-

On the final day of trial, before instructing the jury, the district court engaged in a colloquy with the parties regarding the jury instructions and verdict form. When the court raised the question of whether punitive damages were available under the causes of action pleaded, plaintiffs' counsel misrepresented to the court that punitive damages could be awarded against the individual defendants under the Rehabilitation Act, and so were available through the vehicle of § 1983.[13] Plaintiffs' counsel did not tell the court that the Supreme Court had held that punitive damages were unavailable under the Rehabilitation Act. See Barnes v. Gorman, 536 U.S. 181, 189 (2002). Defense counsel failed to object that punitive damages were unavailable as a matter of law; failed to remind the court that not only had the Rehabilitation Act claim

_____

dismissed the claim against Rey in his personal capacity, plaintiffs amended their complaint to plead a Rehabilitation Act claim solely against the Commonwealth defendants. Plaintiffs also originally pleaded a cause of action under Title II of the ADA, but the court correctly dismissed that claim early in the case, and plaintiffs took no appeal. After the entry of default, however, plaintiffs attempted to resurrect the Title II claim, surreptitiously reintroducing it by way of their proposed jury instructions. Plaintiffs also floated a theory that they had an independent cause of action under 42 U.S.C. § 1983 and submitted jury instructions to that effect, even though neither their original or amended complaints ever alleged a § 1983 violation.

[13] The court inquired of plaintiffs' counsel: "[I]s there case law that allows for the imposition of punitive damages in a case like this?" Counsel responded: "Under the Rehabilitation Act, yes . . . . [T]here is case law indicating that the same damages that are available generally under a 42 U.S.C. [§] 1983 case are available under the Rehabilitation Act, and that would be the one particular legal claim that would provide for punitive damages in this case."

in the original complaint against Rey in his personal capacity already been dismissed, but also that the amended complaint did not allege a Rehabilitation Act claim against the individual defendants; and failed to alert the court that the § 1983 and Title II claims were never pleaded in the amended complaint.[14]

In due course, the district court instructed the jury on both Title II and § 1983, and further advised the jury that punitive damages were available under federal law,[15] so long as defendants' actions involved deliberate indifference toward the rights of another. Defendants did not make any relevant objections to these instructions or to the verdict form. The jury proceeded to award a total of $100,000 in punitive damages to Lyssette against Rey and Ríos in their personal capacities.

Not until their post-verdict motion did defendants argue that punitive damages were unavailable under the pleaded causes of action as a matter of law. The district court issued an order summarily denying their motion, from which they now appeal.

It is black letter law that punitive damages -- indeed money damages of any sort -- are not available in a private suit under the IDEA. See Nieves-Márquez v. Puerto Rico, 353 F.3d 108,

---

[14] The only argument that defense counsel made as to punitive damages was that Rey and Ríos ought to be protected by qualified immunity on the federal claims because the evidence was insufficient to show their personal involvement.

[15] Punitive damages are not available under the Puerto Rico law claims.

124 (1st Cir. 2003) (holding that the only monetary awards available under the IDEA are "[a]wards of compensatory education and equitable remedies that involve the payment of money, such as reimbursements to parents for expenses incurred on private educational services to which their child was later found to have been entitled"). Nor are punitive damages available under the Rehabilitation Act. See id. at 126; see also Barnes, 536 U.S. at 189 ("[P]unitive damages may not be awarded in . . . suits brought under . . . § 504 of the Rehabilitation Act."). This was the law at the time of trial, as counsel for both sides should have known.

On appeal, plaintiffs add the argument that punitive damages were justified under Title II of the ADA. The law is equally clear that no punitive damages are available under that cause of action either. See Barnes, 536 F.3d at 189; Nieves-Márquez, 353 F.3d at 126.

Plaintiffs next attempt to recharacterize this case as a § 1983 case and so justify an award of punitive damages.[16] We

---

[16] Defendants argue that to the extent the court's instructing the jury on § 1983 can be construed as permitting a constructive amendment to the pleadings, such an amendment was an abuse of discretion on the part of the court, since it "permitted [p]laintiffs to enjoy the benefits of having default entered against [d]efendants even on a claim that [plaintiffs] had not included in their [c]omplaint." Defendants also argue that even if plaintiffs properly raised a § 1983 claim, plaintiffs nevertheless failed to allege or show that Ríos and Rey were personally responsible for any discrimination against Lyssette. Finally, defendants argue that Ríos and Rey were entitled to qualified immunity. We need not reach any of these arguments.

-25-

reject the argument and hold that § 1983 cannot be used to escape the strictures on damages under the IDEA, which preclude both punitive damages and general compensatory damages, where the § 1983 claim is premised on a right created by the IDEA. As we observed in Nieves-Márquez, "if federal policy precludes money damages for IDEA claims, it would be odd for damages to be available under another vehicle, . . . where the underlying claim is one of violation of IDEA." 353 F.3d at 125; see also id. at 125-26 (noting that "[s]everal circuits have barred money damages under 42 U.S.C. § 1983 for IDEA-based claims for precisely this reason"). After all, plaintiffs cannot circumvent other requirements of the IDEA, such as the requirement to exhaust administrative remedies, see 20 U.S.C. § 1415(l), merely by pleading under § 1983. See Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 60-64 (1st Cir. 2002). Allowing plaintiffs to claim money damages under § 1983 "would subvert . . . the overall scheme that Congress envisioned for dealing with educational disabilities," id. at 63, as well as the purpose of the IDEA, which simply "is to ensure FAPE," Nieves-Márquez, 353 F.3d at 125. See also Sellers by Sellers v. Sch. Bd., 141 F.3d 524, 529 (4th Cir. 1998) (holding that the "IDEA provides a comprehensive remedial scheme for violations of its own requirements" that cannot be circumvented by means of a § 1983 claim).

As noted in Nieves-Márquez, see 353 F.3d at 116 n.4, the text of the IDEA specifically states that the statute does not "restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities," 20 U.S.C. § 1415(l). This text was added as a reaction to the Supreme Court's decision in Smith v. Robinson, 468 U.S. 992 (1984), which held that the predecessor statute to the IDEA was "the exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education." Id. at 1009. We read the caveat set out in 20 U.S.C. § 1415(l) as intended to ensure that the IDEA does not restrict rights and remedies that were already independently available through other sources of law. Situations in which the caveat would be applicable surely exist, but this is not one of them. Plaintiffs' case turns entirely on the rights created by statute in the IDEA. They did not plead a § 1983 action in their complaints, nor did they state a constitutional claim. They also have no viable independent claim under Title II of the ADA or section 504 of the Rehabilitation Act.[17]

---

[17] Plaintiffs made allegations of retaliation in their amended complaint. However, plaintiffs have not suggested that these allegations go to an independent claim under the Rehabilitation Act, and the Rehabilitation Act claims against the individual defendants were correctly dismissed.

We hold that where the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983 -- or any other federal statute for that matter -- in an attempt to evade the limited remedial structure of the IDEA.  See Bradley v. Ark. Dep't of Educ., 301 F.3d 952, 957 (8th Cir. 2002) ("Because the [plaintiffs] cannot recover damages against the state officials in their individual capacities under the IDEA, they also cannot recover those damages in a § 1983 suit for violations of the IDEA."); Heidemann v. Rother, 84 F.3d 1021, 1033 (8th Cir. 1996) ("We simply hold that plaintiffs' claims based upon defendants' alleged violations of the IDEA may not be pursued in this § 1983 action because general and punitive damages for the types of injuries alleged by plaintiffs are not available under the IDEA." (citing Crocker v. Tenn. Secondary Sch. Athletic Ass'n, 980 F.2d 382, 386 (6th Cir. 1992))); see also Padilla ex rel. Padilla v. Sch. Dist. No. 1, 233 F.3d 1268, 1273-74 (10th Cir. 2000) (holding that § 1983 is not available to enforce the IDEA); Sellers, 141 F.3d at 529 (same).

B.        Compensatory Damages

In addition to the punitive damages, the jury awarded general compensatory damages in the amount of $45,000 for Díaz and $3000 for Lyssette against the Commonwealth defendants and Rey and Ríos, in their personal capacities.

At trial, Díaz testified that she sustained an array of economic damages, including: (1) wages lost while attending administrative hearings and IEP meetings; (2) copying and other paperwork costs in preparation for administrative proceedings; (3) medical deductibles for psychiatric treatment for Lyssette; (4) private school tuition in the amount of $3248.24 for the 2003-2004 school year and "around $3400" for the 2004-2005 school year (seventh and eighth grade, respectively); and (5) transportation costs to and from private school. Díaz also testified about future expenditures she expected to pay for Lyssette's private school education, adaptive physical education, transportation, and psychological counseling through the 2005-2006 school year. Plaintiffs stated in closing arguments that the sum of all of Díaz's economic damages, past and prospective, was $44,813.44. They did not attempt to quantify damages for emotional harm, though they argued that Díaz did suffer such harm on account of defendants' conduct. Lyssette did not testify as to any specific losses, though she did say that defendants' actions made her feel "bad" and isolated, and caused her to have to seek counseling.

The court did instruct the jury on the elements of liability under an IDEA claim and on the procedural and substantive entitlements students and parents have under the IDEA, but it did not instruct on the limited remedial options available under that statute. Rather, the district court instructed the jury that

compensatory damages were available under § 1983 and the Rehabilitation Act. It also instructed the jury that, for violations of Law 51, see P.R. Laws Ann. tit. 18, §§ 1351-1359, which is the Puerto Rican analog to the IDEA, Puerto Rico's general negligence statute applied, see P.R. Laws Ann. tit. 31, §§ 5141-5142, which meant that reasonable damages for emotional pain, mental anguish, lost income, and medical expenses were available.

The court then presented the jury with a general verdict form that asked, with respect to compensatory damages, "[w]hich defendant[s] are responsible" and the amount of damages awarded in favor of each plaintiff.

As said, we review defendants' challenges to the compensatory damages for plain error.[18]

### 1. Compensatory Damages Against the Commonwealth Defendants

Defendants argue that the types of compensatory damages awarded by the jury were not available as a matter of law.

---

[18] Defendants objected to the verdict form and to the instructions, but on grounds not pertinent here.

In their post-trial motion, which the district court summarily denied, the Commonwealth defendants argued that the types of compensatory damages the jury awarded were not available as a matter of law under the IDEA and the Rehabilitation Act, and that the Eleventh Amendment gave them immunity for the Puerto Rico law claims. The individual defendants also argued that there was no surviving federal cause of action against them in their personal capacities, that they were entitled to qualified immunity, and that they were not personally liable under state law.

-30-

a.    Compensatory Damages on Federal Claims

The key question is whether the IDEA permitted an award of the various types of damages sought, given that we have held that the other federal causes of action, on the facts here, do not provide any broader remedies than those available under the IDEA.[19]

"[T]ort-like money damages" are not within the scope of appropriate relief under the IDEA, because the "IDEA's primary purpose is to ensure FAPE, not to serve as a tort-like mechanism for compensating personal injury." Nieves-Márquez, 353 F.3d at 124-25. This was the law of this and every other circuit that had addressed the issue by the time of trial.[20]

In an IDEA-based suit like this one, monetary relief is limited to "[a]wards of compensatory education and equitable remedies that involve the payment of money, such as reimbursements to parents for expenses incurred on private educational services to which their child was later found to have been entitled." Id. at

---

[19]    Plaintiffs do not attempt to justify the compensatory damages award under § 1983. We deal with whether compensatory damages are available against defendants under state law in a following section.

[20]    Accord Gean v. Hattaway, 330 F.3d 758, 774 (6th Cir. 2003); Polera v. Bd. of Educ., 288 F.3d 478, 483-86 (2d Cir. 2002); Witte v. Clark County Sch. Dist., 197 F.3d 1271, 1275 (9th Cir. 1999); Sellers, 141 F.3d at 526-27; Charlie F. by Neil F. v. Board of Educ., 98 F.3d 989, 991 (7th Cir. 1996); Heidemann, 84 F.3d at 1033; see also Ortega v. Bibb County Sch. Dist., 397 F.3d 1321, 1325-26 (11th Cir. 2005); Crocker, 980 F.2d at 386-87 (general damages not available under predecessor statute to the IDEA); Manecke v. Sch. Bd., 762 F.2d 912, 915 n.2 (11th Cir. 1985) (same).

124. The IDEA provides that "a court or a hearing officer may require the agency to reimburse the parents for the cost of [private school] enrollment if the court or hearing officer finds that the agency had not made [FAPE] available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii); see also Ms. M. ex rel. K.M. v. Portland Sch. Comm., 360 F.3d 267, 268 (1st Cir. 2004). Such "[r]eimbursement is 'a matter of equitable relief, committed to the sound discretion of the district court.'"[21] Roland M. v. Concord Sch. Comm., 910 F.2d 983, 999 (1st Cir. 1990) (quoting Town of Burlington v. Dep't of Educ., 736 F.2d 773, 801 (1st Cir. 1984), aff'd sub nom. Sch. Comm. v. Dep't of Educ., 471 U.S. 359, 369 (1985)); see also Florence County Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 16 (1993) ("Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required."). In fashioning appropriate relief, courts have generally interpreted the IDEA as allowing reimbursement for the cost not only of private school tuition, but

---

[21] The issue of tuition reimbursement is, therefore, an issue for the judge, not the jury. In this case, however, neither party raised an objection on this ground, and we have no reason to conclude that the court would not have granted reimbursement had it reserved the decision for itself. Cf. Fed. R. Civ. P. 39(c) ("In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury . . . ."). In fact, the court did grant partial tuition reimbursement as part of the declaratory judgment.

also of "related services," see 20 U.S.C. § 1401(26) (defining "related services" to include "transportation, and such developmental, corrective, and other supportive services (including . . . psychological services . . .) as may be required to assist a child with a disability to benefit from special education"). See, e.g., Sch. Comm., 471 U.S. at 369 (allowing for reimbursement under the predecessor statute to the IDEA); M.M. ex rel. C.M. v. Sch. Bd., 437 F.3d 1085, 1100-01 (11th Cir. 2006) (per curiam); see also 34 C.F.R. § 300.24. This law was also clear at the time of trial.

We quickly dispose of one defense argument. Pointing to a provision of the IDEA, which states that the cost of reimbursement "may be reduced or denied" in certain circumstances, such as "upon a judicial finding of unreasonableness with respect to actions taken by the parents," 20 U.S.C. § 1412(a)(10)(C)(iii), defendants argue that Díaz was not entitled to reimbursement because her actions were unreasonable. But the jury verdict and grant of substantial damages confirmed that defendants' proposed IEPs were inadequate and untimely. Under these circumstances, we cannot conclude that Díaz's decision to enroll Lyssette in a private school was so unreasonable that it was an abuse of discretion to award tuition reimbursement.

Defendants' final argument, that Díaz is not entitled to prospective relief in the amount of future educational expenses until Lyssette reaches maximum school age, has more bite. As the

term "reimbursement" suggests, tuition reimbursement is a backward-looking form of remedial relief; "[r]eimbursement merely requires the [defendant] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." Sch. Comm., 471 U.S. at 371-72. It goes without saying that those "expenses" must be actual and retrospective, not anticipated. Indeed, this reasoning is at the heart of the distinction, recognized by this court, between "tuition reimbursement" and "compensatory education."[22] See Ms. M. ex rel. K.M., 360 F.3d at 273 ("[W]hen this court has used the term 'compensatory education,' it has usually assumed that the remedies available involve prospective injunctive relief, which would not encompass tuition reimbursement."); see also id. at 273-74 (citing cases). This was also plainly the law at the time of trial.

Under normal IDEA principles, Díaz is thus not entitled to be reimbursed for educational expenses that she has yet to pay. She is entitled to no more than the sum of the educational expenses she has already paid -- that is, the sum of Lyssette's private school tuition and costs for transportation, see 34 C.F.R. § 300.24(b)(15), and psychological services, see id.

---

[22] Plaintiffs do not take issue with defendants' characterization of the relevant parts of the jury award as "tuition reimbursement," and do not attempt to recast that award as "compensatory education." Nor do plaintiffs argue that tuition reimbursements are available under Puerto Rico law. In fact, plaintiffs do not respond at all to any of defendants' arguments with respect to tuition reimbursement.

§ 300.24(b)(9), that she has paid through the conclusion of the 2005-2006 school year.[23] All other "compensatory damages" awarded by the jury, including those for lost wages and emotional distress, are simply not available as a matter of law. We discuss later whether defendants are nonetheless bound to pay damages not available as a matter of law because of their failure to timely object.

b. State Immunity from Compensatory Damages Under Puerto Rico Law

"[I]n the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); see also Edelman v.

---

[23]    Although it is true that reimbursement can only be retrospective, the "stay-put" provision of the IDEA requires Lyssette to remain in her "then-current educational placement" -- that is, her current private school placement -- "during the pendency of any [administrative or judicial] proceedings conducted pursuant to [20 U.S.C. § 1415]." 20 U.S.C. § 1415(j). The law does not firmly establish whether "the pendency of any [judicial] proceedings" includes review through the court of appeals, and the parties have not briefed the issue of whether Díaz is entitled to reimbursement for the costs of tuition and related services that she has already incurred through the conclusion of these appellate proceedings. In the context of this case, in which there has been so many defaults on the part of the Commonwealth defendants, it is equitable to permit reimbursement through the school year ending with the issue of our judgment -- that is, the 2005-2006 school year. We also take into consideration the facts that the jury determined that Díaz had properly enrolled Lyssette in private school, that Díaz has already paid for this year's tuition and related services, and that, from what we understand, as of the date of issuance of this opinion, Lyssette not only has finished the school year, but also has graduated from middle school.

Jordan, 415 U.S. 651, 662-63 (1974). "This jurisdictional bar applies regardless of the nature of the relief sought." Pennhurst, 465 U.S. at 100.

Plaintiffs argue that the compensatory damages award, if not available under federal law, is justifiable under §§ 1802 and 1803 of the Puerto Rico Civil Code, which is the general negligence statute.[24] See P.R. Laws Ann. tit. 31, §§ 5141, 5142. Taking advantage of the rule that "Eleventh Amendment immunity can be raised at any time because of its jurisdictional implications," Acevedo López v. Police Dep't, 247 F.3d 26, 28 (1st Cir. 2001), the Commonwealth defendants invoke for the first time on appeal their Eleventh Amendment immunity against suit in federal court on the Puerto Rico law claims. Plaintiffs offer no response.

The Commonwealth of Puerto Rico is treated as a state for purposes of Eleventh Amendment immunity analysis. Redondo Constr. Corp. v. P.R. Highway & Transp. Auth., 357 F.3d 124, 125 n.1 (1st Cir. 2004). The Commonwealth can waive its immunity in three ways: "(1) by a clear declaration that it intends to submit itself to the jurisdiction of a federal court . . . ; (2) by consent to or participation in a federal program for which waiver of immunity is

---

[24]    Section 1802 of the Civil Code provides: "A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. Section 1803 extends § 5141 to the Commonwealth: "The Commonwealth is liable in this sense under the same circumstances and conditions as those under which a private citizen would be liable." Id. § 5142.

an express condition; or (3) by affirmative conduct in litigation." New Hampshire v. Ramsey, 366 F.3d 1, 15 (1st Cir. 2004) (citations omitted). But the Commonwealth's "waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." Pennhurst, 465 U.S. at 99 n.9.

The Commonwealth defendants do not have Eleventh Amendment immunity against the federal IDEA and Rehabilitation Act claims, because they waived such immunity by accepting federal funds. See 20 U.S.C. § 1403(a) (conditioning a state's receipt of federal IDEA funds to its consent to suit under that statute); 42 U.S.C. § 2000d-7(a)(1) (same under the Rehabilitation Act); see also Nieves-Márquez, 353 F.3d at 127-30.

Although the Commonwealth has consented to be sued for damages in actions brought under the Commonwealth general negligence statute, such consent does not extend to actions filed in any courts but the Commonwealth's own. Neither Section 1802 or 1803 contains an explicit waiver of the Commonwealth's sovereign immunity. And Law 104, P.R. Laws Ann. tit. 32, § 3077, which abrogates the Commonwealth's immunity with respect to negligence suits filed against the Commonwealth in Puerto Rico's Court of the First Instance, does not extend that waiver to suits filed in federal court. See Pennhurst, 465 U.S. at 99 & n.9 (noting that "[a] State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued").

-37-

Moreover, as defendants point out, Law 51 itself does not waive the Commonwealth's immunity from suit in federal court; indeed, that statute does not even explicitly authorize private suits for its enforcement in any court, let alone in federal court.[25] Plaintiffs do not direct us to any law to the contrary, nor do they argue that the Commonwealth has waived its immunity by any other means, such as by its litigation conduct.

Defendants argue that the Commonwealth's immunity extends to its Department of Education. This court has assumed without discussion that the DOE's Eleventh Amendment immunity is coextensive with that of the Commonwealth's. Fernandez v. Chardon, 681 F.2d 42, 59 (1st Cir. 1982); Litton Indus., Inc. v. Colon, 587 F.2d 70, 72 (1st Cir. 1978) ("There is no doubt that the complaint states a cause of action against the Commonwealth and/or the Department of Education of Puerto Rico for breach of contract, and it is equally clear that the [E]leventh [A]mendment effectively bars such a claim."). More recently, we have "assume[d] without deciding that the Department of Education is properly considered the alter ego of the Commonwealth of Puerto Rico for purposes of

---

[25] Law 51 states that parents of a disabled student are entitled to "[f]ile complaints to request a mediation meeting or an administrative hearing." P.R. Laws Ann. tit. 18, § 1353(b)(2)(D). It also provides that "parents shall be entitled to . . . [h]ave any objection on their part considered diligently at the corresponding level, including those cases whose particular circumstances merit determinations at state level or in the pertinent forum." Id. § 1353(b)(2)(F).

-38-

[E]leventh [A]mendment analysis."  Marin-Piazza v. Aponte-Roque, 873 F.2d 432, 437 n.6 (1st Cir. 1989).  We do so again here, since plaintiffs have utterly failed to present any argument to the contrary.

Plaintiffs, therefore, cannot look to state law to justify the "compensatory damages" award against the Commonwealth defendants.

### 2. Compensatory Damages Against the Individual Defendants in Their Personal Capacities

The jury determined that each of the individual defendants (in addition to the Commonwealth defendants) was responsible for the compensatory damages award, totaling $48,000.

Our discussion earlier demonstrates that the likely basis for the award was under the Rehabilitation Act or § 1983 theories, neither of which had been pleaded against the individual defendants in the amended complaint.  We have also discussed why the award (to the extent it represents general damages) is not, in any event, viable as a matter of law on those bases.  And so we return to what this case is really about -- a claim under the IDEA -- to see if the IDEA authorizes a monetary award against individuals in their personal capacities.

Plaintiffs do not even attempt to defend the award of damages against the individuals; they merely assert that compensatory damages are generally available against defendants as a group.  We have already held that general compensatory damages

-39-

are not available at all under the IDEA.  We add that the IDEA does not permit an award of any monetary relief, including tuition reimbursement and compensatory education, against individual school officials who are named in their personal capacities as defendants in an IDEA action.  As the Eighth Circuit recognized in Bradley v. Arkansas Department of Education, 301 F.3d 952, "the IDEA is devoid of textual support for . . . an award" of education expenses against individual defendants; "such expenses would be recoverable [only] from the school district" (or public agency).  Id. at 957 n.6.  Indeed, the plain text of the statute authorizes reimbursement of educational expenses only against the agency, not against any of its officials.  See 20 U.S.C. § 1412(a)(10)(C)(ii) ("If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment."  (emphasis added)).  That only the public agency is liable for reimbursement follows naturally from the fact that Congress assigned to the agency the ultimate responsibility for ensuring FAPE.  See id. § 1400(c)(6) ("States, local educational

agencies, and educational service agencies are primarily responsible for providing an education for all children with disabilities . . . ."); id. § 1401(9)(A) (requiring that FAPE be "provided at public expense, under public supervision and direction, and without charge").  No claim for monetary relief can thus be stated against individual defendants under IDEA.

This leaves as a possible justification for a monetary award against the individual defendants only the pendent state claims under Law 51, see P.R. Laws Ann. tit. 18, §§ 1351-1359, and Puerto Rico's general negligence statute, see P.R. Laws Ann. tit. 31, §§ 5141-5142.  It is, in our view, doubtful that Law 51 (even when combined with the general negligence statute) permits private party actions for damages against individuals in their personal capacities, as opposed to suits against individual defendants in their official capacities.  Cf. Bonilla v. Chardon, 18 P.R. Offic. Trans. 696, 704, 710-11 (P.R. 1987) (allowing for an award of compensatory damages under the general negligence statute for a "gross" violation of the predecessor statute to Law 51 against the DOE and its officers in their official capacities).  Plaintiffs have simply asserted there is such a claim.  We are not inclined to subject individual state officials to personal liability for monetary relief in IDEA analog suits absent a clearer indication from the courts of Puerto Rico that such a claim is available under

their law. Federal courts do not engage in wholesale expansion, or indeed creation, of state law theories of action.

### 3. Effect of Defendants' Failure to Timely Raise Legal Defenses

Plaintiffs argue that, whatever the legal deficiencies of the punitive and compensatory damages awards, defendants waived any challenge to those awards by failing to object in a timely manner to the jury instructions and verdict form. See Fed. R. Civ. P. 51(b)(2), (c)(2) (stating that a party that has been informed of an instruction before the jury is instructed and before final jury arguments must object to the instruction on the record "before the instructions and arguments are delivered"); see also Fed. R. Civ. P. 51(d)(1)(A). However, "[f]ailures to object, unless a true waiver is involved, are [mere forfeitures that are] almost always subject to review for plain error." Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) (per curiam); see also Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions affecting substantial rights that has not been preserved as required . . . ."). It is clear here that there was no knowing waiver by defendants, merely forfeiture.

To succeed under the plain error standard, defendants must show that: "(1) an error was committed; (2) the error was 'plain' (i.e.[,] obvious and clear under current law); (3) the error was prejudicial (i.e.[,] affected substantial rights); and (4) review is needed to prevent a miscarriage of justice," meaning

-42-

that "the error 'seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 10 (1st Cir. 2004) (quoting Smith v. Kmart Corp., 177 F.3d 19, 26 (1st Cir. 1999); Muñiz v. Rovira, 373 F.3d 1, 6 (1st Cir. 2004)) (some internal quotation marks omitted); see also Fed. R. Civ. P. 51 advisory committee's note (listing "at least" four factors relevant to a finding of plain error: (1) "the obviousness of the mistake," (2) "[t]he importance of the error," (3) "[t]he costs of correcting [the] error," and (4) "the impact a verdict may have on nonparties"). The standard is high, and "it is rare indeed for a panel to find plain error in a civil case." Chestnut, 305 F.3d at 20.

The present case is one of those rare occasions when the standard is met. Here, the errors of law were plain: punitive damages and tort-like compensatory damages were not authorized under any of the causes of action alive at the time of trial against any of the defendants. Moreover, the legal errors were clearly prejudicial to defendants: the jury would not have granted the $100,000 punitive damages award and over $30,000 in tort-like compensatory damages had it not been instructed, contrary to law, that such damages were available. Finally, the errors, while compounded by defendants' silence, were in major part created by plaintiffs' active misleading of the court as to the law.

-43-

Allowing the award to stand would be a miscarriage of justice. See id. (reviewing for plain error and vacating a punitive damages award, in part because allowing the award to stand would be a miscarriage of justice); Hurley v. Atl. City Police Dep't, 174 F.3d 95, 123-24 (3d Cir. 1999) (same); Williams v. City of New York, 508 F.2d 356, 362 (2d Cir. 1974) (vacating punitive damages award against defendant municipality on plain error review because of "the demonstrable deviation of the court's instruction here from the appropriate standard, the serious harm suffered by the defendant as a result of this error, and the remediability of this error without a new trial below").

This is especially so because the windfall of such awards to IDEA plaintiffs would likely come at the expense of other educational benefits for other schoolchildren by diverting from them scarce educational resources. See Chestnut, 305 F.3d at 20-21. The Supreme Court recognized this principle in City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981), in which it vacated, on plenary review, an award under § 1983 of punitive damages against a municipality, even though defendants failed to object to the charge at trial, in part because "punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill." Id. at 267. The Court also observed that "[n]either

reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." Id. In Chestnut, this court, sitting en banc, vacated damages on plain error review in similar circumstances.[26] See 305 F.3d at 22.

We are also influenced by the fact that it would be a miscarriage of justice to allow an award to stand, where that award was brought about by plaintiffs' misleading the court about the law. See id. at 20 (finding a "miscarriage of justice" where "[p]laintiff's counsel, quite erroneously, represented to the district court at the charge conference that punitive damages were permissible against a municipality"). Had plaintiffs not misled the court as to the law and defendants not stood silent, we doubt the jury would ever have been asked to award punitive damages.

---

[26] In Chestnut, this court vacated a jury award of $500,000 in punitive damages against the co-defendant municipality, where defense counsel remained silent as plaintiff's counsel misled the court that punitive damages were available, even though a twenty-year-old Supreme Court precedent held otherwise; neither party brought the precedent to the attention of the trial court until after the jury verdict; and the windfall to the plaintiff would have come at the expense of innocent taxpayers. See 305 F.3d at 20-21.

Plaintiffs argue that Chestnut is inapposite because it vacated damages solely as to the municipality, not as to the co-defendant police officer who was sued in his personal capacity. They point out that the punitive damages here were assessed against Rey and Ríos in their personal capacities, and not against the Commonwealth defendants. But the Commonwealth generally indemnifies its officials for suits against them in their personal capacities, see P.R. Laws Ann. tit. 32, § 3085, and it has not declared its intention not to do so in this case. Moreover, here, as in Chestnut, other factors in addition to impact on nonparties militate strongly in favor of vacating the damages award.

Counsel have a duty to be candid about the law, and the trial court, bearing a heavy caseload, relies on counsel to meet that duty. Given the press of work, our trial court system would break down if the court had to stop and independently research every point of law on which counsel appear to agree or, at least, not to disagree. The situation here is especially egregious because the district court explicitly asked whether punitive damages were available and gave both parties an opportunity to respond.

Further, to let this award stand would contravene Congress's intent as expressed in the IDEA. In choosing not to authorize tort-like monetary damages or punitive damages in cases under the IDEA, Congress made a balanced judgment that such damages would be an unjustified remedy for this statutorily created cause of action. No doubt Congress had in mind that public elementary and secondary education have access to only limited resources and that a sizeable damages award would divert resources to litigants and away from direct expenditure on education. In this case, the public interest in not sustaining the award outweighs the public interest in a smoothly functioning judicial system, which generally requires parties to state their defenses or lose them.

Defendants should take little comfort in this outcome. A continuing pattern of poor advocacy by the Commonwealth in IDEA cases could lead to the balance tipping the other way in future

cases. One understands the palpable frustration of the trial judge.

As to the monetary relief authorized by law, we cannot know whether the jury would have awarded any damages to plaintiffs had defendants not been precluded from presenting evidence as a result of the default order. Perhaps defendants would have won on liability. We leave in place the monetary relief awarded by the jury that was available under the law and remand to the district court for such adjustments as are appropriate.

IV.

Challenge to the Grant of Declaratory Relief

We turn to defendants' final challenge, which is to the declaratory judgment entered by the district court, which effectively also encompassed declaratory relief.

In their amended complaint, plaintiffs requested only that the court "[d]eclar[e] the defendants to be in violation of the IDEA, the Rehabilitation Act, Law 51, and the Puerto Rico Constitution," pursuant to 28 U.S.C. § 2201, and that it grant "further necessary and proper relief as provided for under 28 U.S.C. § 2202."

The problem arises because after the trial, in a motion, plaintiffs asked for more extensive and specific declaratory and injunctive relief,[27] in the form of the following five items:

_____

[27] Plaintiffs styled their motion as a "Request for Declaratory Relief"; nevertheless, the nature of the relief sought and granted went beyond a mere declaration of rights.

-47-

(1) [T]he reinstatement of Lyssette Cardona Díaz with respect to prospective receipt of benefits to which she is entitled as a physically disabled student under . . . the Rehabilitation Act . . . and the [IDEA]. Specifically, plaintiffs request that the defendants provide [Lyssette] with adapted physical education, i.e., swimming, in accordance with her special physical needs, the reinstatement of her transportation services, as well as the current private school placement and psychiatric services, at public expense. The provision of these benefits should continue until [Lyssette] reaches the maximum public school age. The plaintiffs also request as ancillary relief that the Court impose a daily accruing fine if the defendants fail to comply with this dictate in a timely fashion.

(2) [A] declaration of plaintiff Marta Díaz Fonseca's compliance with the requirements for unilateral placement by parents of children in private schools at public expense according to [the] IDEA, and that therefore she is entitled to the reimbursement of the costs of [Lyssette's] placement . . . . Specifically, as ancillary relief to this declaration, the plaintiffs request that the Court order reimbursement of $3,298.24 for school year 2003-2004; and $1,220.00 paid as of October[] 2004 for [the] 2004-2005 school year, for a total of $4,518.24 to be reimbursed by defendant Department of Education.

(3) [A] declaration that the defendants' system of hiring administrative law judges under the auspices of the Department of Education is illegal and violative of the pertinent provisions of the [IDEA], which requires that said judges not be employees of a regulated body and instead be independent. Plaintiffs request that this Court set reasonable terms and timelines for the defendants to come into compliance with applicable law.

(4) [A] declaration that the defendants' system of parental involvement in the IEP process and their system of keeping minutes and maintaining appropriate, complete administrative records violates the [IDEA]. The plaintiffs also request as ancillary relief that the Court impose a daily accruing fine if the defendants fail to comply with this these [sic] requirements henceforth in a timely fashion.

(5) [A] declaration that the defendants' system of provision of physical therapy without the referral or prescription of a medical doctor violates Puerto Rico Law, [P.R. Laws Ann. tit. 20, § 241(2)]. The plaintiffs also request as ancillary relief that the Court impose a daily accruing fine if the defendants fail to comply with this these [sic] requirements henceforth in a timely fashion.

Over defendants' objections, the district court summarily granted on January 3, 2005 the entirety of plaintiffs' motion and gave defendants thirty days to comply with the declaratory judgment order. The court then denied on February 7, 2005 defendants' motion to reconsider, alter, or amend that order. The court backed up its order with threats of contempt and monetary sanctions for non-compliance.

We agree with defendants that the district court abused its discretion in granting the order and reverse and vacate the declaratory judgment in its entirety.

A.      The Relevant Law

"The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 . . . , empowers a federal court to grant declaratory relief in a

case of actual controversy." <u>Ernst & Young</u> v. <u>Depositors Econ.</u> <u>Protection Corp.</u>, 45 F.3d 530, 534 (1st Cir. 1995). The Act "neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies." <u>El Dia, Inc.</u> v. <u>Hernandez Colon</u>, 963 F.2d 488, 493 (1st Cir. 1992). "Consequently, federal courts retain substantial discretion in deciding whether to grant declaratory relief." <u>Ernst & Young</u>, 45 F.3d at 534.

Our review of the district court's exercise of its decision to grant declaratory relief "is conducted under a standard slightly more rigorous than abuse of discretion." <u>Nat'l R.R.</u> <u>Passenger Corp.</u> v. <u>Providence & Worcester R.R. Co.</u>, 798 F.2d 8, 10 (1st Cir. 1986). "This approach requires that we attentively digest the facts and the district court's stated reasons for granting . . . declaratory relief." <u>El Dia, Inc.</u>, 963 F.2d at 492. Ultimately, "we cede some deference to the trier, especially as to findings of fact, but we will not hesitate to act upon our independent judgment if it appears that a mistake has been made." <u>Id.</u>

Some of the declaratory relief is particular to plaintiffs. Much of it is far broader and intended to effectuate what is essentially class-wide relief. This case has never been styled as a class action, no class has ever been certified, and there is no evidence on which such broad relief can be justified.

Further, the request for these specific items of declaratory relief was made at the last minute, and defendants were not on notice during the trial that such relief would be sought. From these facts alone, the declaratory relief must be vacated. Still, we go on to deal with the other problems with each portion of the order.

B.        Items 1 and 2

We begin with the first two items of relief set forth in the declaratory judgment order. The first item requires defendants to provide Lyssette with an array of benefits to which she claims to be entitled under the IDEA and the Rehabilitation Act through maximum school age and at public expense. The second declaration is that Díaz was fully compliant with the IDEA when she unilaterally enrolled Lyssette in private school and is thus entitled to reimbursement of educational expenses totaling $4518.24, pursuant to 20 U.S.C. § 1412(a)(10)(C)(ii).

As to the first item of declaratory relief, defendants reiterate their objection that plaintiffs are at most entitled to reimbursement of expenses, not to prospective relief under the IDEA and the Rehabilitation Act. Plaintiffs do not respond to defendants' argument; instead, they rehash the ways in which defendants violated plaintiffs' procedural rights under the IDEA. We have already explained why plaintiffs are entitled only to reimbursement for actual expenses incurred, not anticipated

-51-

expenditures for services for which plaintiffs have yet to pay.[28] Cf. Emery v. Roanoke City Sch. Bd., 432 F.3d 294, 299 (4th Cir. 2005) (holding that "[s]tanding doctrine requires that reimbursement [under the IDEA] should flow only to those who actually . . . incurred the expense and suffered the subsequent monetary injury" and therefore that student lacked standing to seek reimbursement, where his father's insurance covered the expenses and "he suffered no out-of-pocket loss himself").

As to the second item of declaratory relief, defendants argue that it impermissibly duplicated relief that was already granted by the jury. Plaintiffs again do not respond to defendants' argument; they reiterate only that the declaration is warranted in light of the record. We agree with defendants that the declaration is redundant and that the ancillary monetary relief amounts to impermissible double recovery. Cf. Ponce v. Ashford Presbyterian Cmty. Hosp., 238 F.3d 20, 22, 25 (1st Cir. 2001) (declining to consider the sufficiency of the evidence in a case in which "the jury's award [was] redundant with plaintiffs' prior

---

[28] Although the amended complaint did seek "the cost of appropriate remedial services, including educational services," plaintiffs do not characterize the prospective relief requested here as compensatory education. Even if they were to have so characterized their claim, their arguments justifying such relief on the basis of defendants' procedural violations of the IDEA would nonetheless be off the mark, as this court has "recognize[d] that compensatory education is not an appropriate remedy for a purely procedural violation of the IDEA." Me. Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 19 (1st Cir. 2003).

settlement and hence constitute[d] an impermissible double-recovery").

Nor is this item of relief any less redundant in light of the outcome of this appeal.  Although we reversed and vacated all other compensatory damages, we let stand the award of reimbursement for the educational expenses Díaz actually incurred, including tuition for the 2003-2004 and 2004-2005 school years.  While "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate," Fed. R. Civ. P. 57, plaintiffs are not entitled to use the declaratory judgment device as an instrument to double their recovery, in the absence of any authority allowing for double damages.  See, e.g., Pate v. Nat'l Fund Raising Consultants, Inc., 20 F.3d 341, 345-46 (8th Cir. 1994) (reversing declaratory judgment on the ground that it was "an impermissible 'double recovery' because the court already entered judgment on a jury verdict for actual damages"). We thus reverse and vacate the first and second items in the declaratory judgment order.

C.      Items 3 and 4

The next two declarations are that defendants' systems of (1) hiring ALJs and (2) "parental involvement in the IEP process and . . . keeping minutes and maintaining appropriate, complete administrative records" are in violation of the IDEA.  Defendants' core objection is that these declarations, in denouncing the whole

system of special education, go beyond the bounds of the complaint and the evidence in this case.  We agree.

These declarations have potentially far-reaching effects on the special education system in Puerto Rico, as well as on the administrative law system there and beyond.  The Supreme Court has "cautioned against declaratory judgments on issues of public moment, even falling short of constitutionality, in speculative situations." Pub. Affairs Assocs., Inc. v. Rickover, 369 U.S. 111, 112 (1962) (per curiam) (citing Eccles v. Peoples Bank, 333 U.S. 426, 432 (1948)); see also Ernst & Young, 45 F.3d at 535 (noting that a court's "discretion to grant declaratory relief is to be exercised with great circumspection when matters of public moment are involved").  Here, the declarations do not meet the test that "the need [for such pronouncements be] clear, not remote or speculative." El Dia, Inc., 963 F.2d at 494 (quoting Wash. Pub. Power Supply Sys. v. Pac. Nw. Power Co., 332 F.2d 87, 88 (9th Cir. 1964)); see also Eccles, 333 U.S. at 431.  Further, the declarations violate the usual rule that the scope of declaratory relief cannot exceed the issues raised by the pleadings and supported by the evidence. See 10B Wright et al., Federal Practice and Procedure § 2768, at 669 (3d ed. 1998).

### 1.    Item 3

The declaration that defendants' system for hiring ALJs violates the IDEA exceeds the scope of the allegations in the

amended complaint, as well as the evidence presented at trial. The amended complaint alleged only the following with respect to the administrative proceedings: that Díaz's administrative complaint "was left aside without resolution in excess of the 45 days established for those proceedings" and that "plaintiffs were denied a fair administrative hearing conducted by an impartial hearing officer." The amended complaint made no mention of the system of hiring ALJs; nor did it state any connection between that system and the DOE's alleged failure to provide plaintiffs with a fair and timely resolution of their claims before the agency.

The evidence presented at trial was similarly inconclusive. Plaintiffs called to the stand Marlene Aponte Cabrera, a former ALJ with the DOE who had been terminated after a half-year of service. Aponte had no direct involvement in plaintiffs' administrative proceedings, but was allowed to testify to, in the district court's words, "the way they handled things there, at the [DOE]." Over defendants' hearsay and relevance objections, plaintiffs elicited testimony from Aponte that she personally did not feel independent in her judgments; that she "was called upon some of [her] decisions"; and that "there were meetings," convened by certain DOE officials,[29] in which her

---

[29] Aponte's testimony was unclear as to which DOE officials convened these meetings. She stated that "[e]ither Iris Rivera or from the legal department, the secretary, . . . would call the" meetings. Rivera, Aponte later explained, was "in administrative remedies," though it is not clear what Rivera's position was in

-55-

"decision[s] and [those] of other judges [were] discussed." Aponte also testified that less than twenty-four hours after a meeting in which Sonia Rosario, head of the special education section of the DOE, questioned Aponte about two of her recent decisions,[30] her contract with the DOE was rescinded.[31]

Aponte's testimony, even if true, does not support a broad declaration pronouncing the entire system of hiring ALJs in violation of the IDEA. Other than confirming that she signed a written contract with the DOE, Aponte did not even testify about the DOE's hiring practices for hearing officers.

Plaintiffs rely primarily on what they allege are the terms of a written contract of employment between the DOE and hearing officers to argue that the declaration was proper. The

---

that department. It is also not obvious whether "the secretary" refers to Rey, the Secretary of Education, or to a secretary in the legal department.

[30] Aponte testified that she "was asked, in front of the other judges, by Ms. Rosario that -- what was I thinking to put such a steep penalty on the Department [by assessing a daily fine against the DOE in one case]? It wasn't -- those weren't the exact words that she told me, but she told me: What happened . . . that made you take that position [in that case]?"
As to the other case, Aponte testified that "they told me I couldn't do that, that wasn't the way to do it, because that would affect the way they operated, because I mentioned a specific account number in my decision." It is not clear from the context what it was precisely that Aponte did.

[31] Defendants attempted to impeach Aponte by eliciting from her testimony designed to show that she was actually terminated because she represented a party as an attorney in a suit against the DOE while she was serving as an ALJ, and that she held a grudge against the DOE because of her termination.

contract itself was not admitted into evidence during Aponte's testimony; the record citations plaintiffs provide are not to the contract or to any document that would support their allegations; and, to the extent that the contract is buried somewhere within the administrative record and the fifteen volumes of appendices the parties have submitted to this court, it is plaintiffs' responsibility to direct the court's attention to it. Since the third item of declaratory relief is devoid of evidentiary support, the district court abused its discretion in granting it.

2. Item 4

For related reasons, the district court abused its discretion in entering the fourth item of declaratory relief, which declares Puerto Rico's systems of "parental involvement in the IEP process[,] . . . keeping minutes[,] and maintaining appropriate, complete administrative records" in violation of the IDEA. The jury verdict established that defendants failed in this case to involve the parent in the IEP process and to maintain complete administrative records.[32] The amended complaint does not allege, and the evidence at trial did not show, that the failures are systemic. See St. Paul Fire & Marine Ins. Co. v. Lawson Bros. Iron Works, 428 F.2d 929, 931 (10th Cir. 1970) ("The judgment in a suit

---

[32] Plaintiffs have not directed us to any provision in the IDEA that requires the keeping of minutes as a matter of course. At trial, plaintiffs' counsel asked Díaz whether the keeping of minutes was required by law. She replied: "I require it."

for declaratory judgment must be responsive to the pleadings and issues presented[,] and . . . a judgment which goes beyond the issues presented constitutes an advisory opinion upon a hypothetical basis, which the court cannot give."  (citing Bus. Men's Assurance Co. v. Sainsbury, 110 F.2d 995 (10th Cir. 1940))). Plaintiffs represent no one but themselves, and they are not entitled to relief that goes beyond the scope of what is necessary to remedy the harms caused to them.

D.      Item 5

The fifth and final item of declaratory relief states that "defendants' system of provision of physical therapy without the referral or prescription of a medical doctor violates Puerto Rico law."  See P.R. Laws Ann. tit. 20, § 241(2) (defining a physical therapist as "[a] professional . . . who applies physiotherapy or physical therapy following the diagnosis and prescription or the referral of a physician").  The item goes beyond a mere declaration to require defendants to come into compliance with Puerto Rico law, "impos[ing] a daily accruing fine . . . [for] fail[ure] to comply . . . in a timely fashion."

Apart from the lack of evidence in the record on which any such relief could be granted, the declaration suffers from an even more serious infirmity: it is contrary to the Eleventh Amendment.  While Ex Parte Young, 209 U.S. 123 (1908), permits injunctive relief based on federal constitutional claims, it does

-58-

not allow injunctive relief against state officials for violation of state law, which is the issue here. See id. at 155-56. In this situation, the Eleventh Amendment bar still holds, because "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." Pennhurst, 465 U.S. at 106. As the Court noted in Pennhurst, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Id.

The fifth declaration plainly runs afoul of Pennhurst. The declaration not only requires the federal court to make pronouncements on the lawfulness of the Commonwealth and its officials' conduct with respect to the Commonwealth's own law, but also has the effect of permitting a federal court to direct Commonwealth officials to comply with that law. See O'Brien v. Mass. Bay Transp. Auth., 162 F.3d 40, 44 (1st Cir. 1998) ("It is not the proper purview of a federal court to supervise state officials' compliance with state law."); see also Cuesnongle v. Ramos, 835 F.2d 1486, 1496-98 (1st Cir. 1987).

Plaintiffs' sole response is a non sequitur. They argue that "medical evaluations are available under" the IDEA. Nevertheless, the relief sought is still under state law. And there is no reference to medical evaluations under 20 U.S.C.

-59-

§ 1401(22), the section of the IDEA to which they cite. That section defines the term "outlying area" for the purpose of the IDEA.

V.

We _affirm_ the district court's default sanction against defendants. We _reverse_ and _vacate_ the punitive and compensatory damages awards against Rey and Ríos in their personal capacities and order dismissal of those claims. We also _reverse_ and _vacate_ the compensatory damages award against the Commonwealth defendants, with the exception of the award of reimbursement for educational expenses of tuition, transportation, and psychological services that Díaz has actually incurred during the 2003-2006 school years, and _remand_ to the district court for the calculation of the amount of the reimbursement, for which only the Commonwealth defendants are liable. The district court may reopen the record and take evidence for the limited purpose of determining the appropriate amount of the reimbursement. Finally, we _reverse_ and _vacate_ the declaratory judgment, and order dismissal of those claims.

No costs are allowed.[33]

---

[33] In their reply briefs, defendants requested compensation from plaintiffs for the cost of translating certain documents and sought sanctions against plaintiffs for their litigation conduct. We deny both of these belated requests.

-60-