**I.M., by and through his Parents and next friends, C.C. and M.M., Plaintiffs**

v.

**NORTHAMPTON PUBLIC SCHOOLS and The Commonwealth of Massachusetts, Division of Administrative Law Appeals, Bureau of Special Education Appeals, Defendants.**

Civil Action No. 11–30214–KPN.

United States District Court, D. Massachusetts.

June 12, 2012.

Catherine Merino Reisman, Reisman Carolla Gran LLP, Haddonfield, NJ, Peter L. Smith, East Longmeadow, MA, for Plaintiffs.

Alisia E. St. Florian, Murphy, Hesse, Toomey & Lehane, LLP, Quincy, MA, James S. Whitcomb, Office of Attorney General, Western Massachusetts Division, Springfield, MA, for Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT AND MOTION TO DISMISS COUNT ONE (Document Nos. 17, 26, and 29)*

KENNETH P. NEIMAN, United States Magistrate Judge.

C.C. and M.M. ("Plaintiffs") initiated this action on behalf of their son I.M. against the Northampton Public Schools ("NPS") and the Bureau of Special Education Appeals ("BSEA") challenging the BSEA's finding that NPS provided him with a free appropriate public education pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1440 *et seq.* Plaintiffs also pursue a claim against NPS under the Americans

with Disabilities Act, 42 U.S.C. § 12132 ("ADA"). Presently before the court is Plaintiffs' motion for summary judgment on Count One, the ADA claim, and on Count Three, the IDEA claim. NPS, for its part, has moved to dismiss Count One and has filed a cross-motion for summary judgment on Count Three. The BSEA itself opposes Plaintiffs' motion for summary judgment on Count Three. Plaintiffs' complaint, it should be noted, initially included a Count Two, but that claim has since been withdrawn.

The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed.R.Civ.P. 73. For the reasons which follow, the court will grant NPS's motions to dismiss and for summary judgment (Document Nos. 26 and 29) and, in turn, will deny Plaintiffs' motion for summary judgment (Document No. 17), thereby entering judgment for both NPS and the BSEA.

### I. The Statutes in Play

#### A. *The IDEA*

The purpose of the IDEA is to ensure "that all handicapped children have available to them a free appropriate public education," *i.e.* a "FAPE." 20 U.S.C. § 1400(d)(1)(A). The IDEA envisions a collaboration between school officials and parents to develop an individualized education program ("IEP"), which is "[t]he primary vehicle for delivery of a FAPE" and must be "individually designed to suit a particular child." *D.B. v. Esposito,* 675 F.3d 26, 34 (1st Cir.2012) (internal quotations omitted). Although a student is not entitled to the maximum educational benefit possible, "an IEP must be reasonably calculated to confer a meaningful educational benefit." *Id.* The IDEA also includes procedural safeguards for the student and his or her parents, including a hearing in front of an impartial hearing officer and the right to judicial review of

that decision in federal court. *See* 20 U.S.C. § 1415(f)-(g). The burden of persuasion lies with the party challenging the appropriateness of an IEP.

#### B. *The ADA*

The ADA prohibits any entity that receives federal funds from discriminating against an individual based on his or her disability. 42 U.S.C. § 12132. *See Calero–Cerezo v. United States DOJ,* 355 F.3d 6, 19 (1st Cir.2004). Among other things, the ADA was enacted to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities. 42 U.S.C. § 12101(a)(7).

### II. Background

I.M., who at the time of the administrative hearing before the BSEA was ten years old, has been diagnosed with dystonic quadriplegic cerebral palsy in the severe range, cortical visual impairment, and apraxia of speech; his disability for purposes of the IDEA is not contested. I.M. attended Leeds Elementary School in Northampton until April of 2010, at which time his parents withdrew him and thereafter applied for his placement at the Perkins School for the Blind in Watertown, Massachusetts. The instant action reflects ongoing disagreements between Plaintiffs and NPS about I.M.'s individualized education plans ("IEP"), specifically the plan formulated in November of 2010.

The BSEA's decision of June 3, 2011, which affirmed the adequacy of the November 2010 IEP, is best understood in the context of events that transpired in the year leading up to its formulation, including two BSEA decisions that preceded the decision currently at issue. Those two decisions, which were never appealed to court, have been included in the administrative record and are described below.

A. *The September and November 2010 BSEA Rulings*

After withdrawing I.M. from the Northampton Schools in April of 2010 and while his application for enrollment at Perkins was pending, Plaintiffs developed a home education program where I.M. was taught for two and one-half hours each day by his mother, in addition to receiving related services from specialists at Boston Children's Hospital. (Administrative Record "A.R." at 653.) Shortly before that withdrawal, Plaintiffs filed with the BSEA a Motion for Interim Placement, whereby they sought public funding for the home-based program. On September 1, 2010, the BSEA denied the motion because Plaintiffs had not demonstrated that the IEP developed and implemented by NPS for the 2009–2010 school year was inappropriate. (A.R. at 654.) As mentioned, that ruling (hereafter the "September Ruling") has not been appealed to this court.

In any event, after Perkins accepted I.M. in April of 2010, NPS sent Plaintiffs a Placement Consent Form, which they signed and, in doing so, generally consented to I.M.'s "residential school" placement at Perkins. (A.R. at 258.) Plaintiffs, however, indicated on the form that, while they "accept[ed] placement," they did not accept the "denial of transportation" and requested a meeting. (Id.) The "denial" to which Plaintiffs referred was NPS's decision to provide transportation for I.M. to and from Perkins in accordance with the school vacation calendar but not on a daily or weekly basis.

Unhappy with NPS's decision, Plaintiffs again sought relief from the BSEA, this time by filing an interim request for reimbursement of expenses incurred in providing daily round-trip transportation. (A.R. at 658.) Plaintiffs' request was filed on September 3, 2010, and a hearing was held on October 15, 2010. On November 30, 2010, the BSEA denied Plaintiffs' request (hereafter the "November Ruling"). The BSEA found that the parties had agreed to residential placement for I.M. and that Plaintiffs' unilateral decision to transport him on a daily basis was not entitled to funding given their failure to demonstrate that, absent such transportation, I.M. would not receive an appropriate education. (A.R. at 661.) That ruling, too, has not been appealed to this court.

B. *I.M.'s 2010–2011 Individual Education Plan*

When Plaintiffs signed the Placement Consent Form in the spring of 2010, they also agreed that a special education team would convene to develop a new IEP for the 2010–2011 school year after I.M. began attending Perkins. (A.R. at 210.) Thus, I.M. started at Perkins on September 8, 2010, with the education plan from the 2009–2010 school year in place, with the understanding that a team would craft a new I.E.P. after Perkins had time to develop a better understanding of I.M.'s needs. (A.R. at 134–35.)

The IEP team convened on November 21, 2010. Plaintiffs, Robert Hair (Education Director for Perkins), and Nathan Ziegler (Director of Special Education for NPS) attended the meeting, as did thirteen other teachers and specialists, among them a developmental specialist, a social worker, a speech language pathologist, an occupational therapist, and a physical therapist. (A.R. at 238.) The details of the resulting IEP are discussed at length in the hearing officer's decision. (See A.R. at 137–139.) Suffice it to say for present purposes, Plaintiffs, at the time of the team meeting, did not raise any concerns about the proposed IEP or seek to make any changes. (Id. at 139.) On January 4, 2011, however, Plaintiffs did not accept the allocation of the 32.5 hours of services set

forth in the IEP, maintaining, among other things, that "speech language supports need to be increased." (Id. at 259.) In addition, Plaintiffs refused I.M.'s placement, claiming that "there is little to no appreciable documentation, recommendation as to why I.M. needs a residential placement." (Id.)

C. *I.M.'s Perkins Experience*

Although Plaintiffs, Perkins, and NPS all understood in early September of 2010 that I.M. would be a residential student at Perkins, Plaintiffs, as indicated, initially transported him there on a daily basis. (A.R. at 135.) To be sure, there is some dispute about exactly when Perkins was ready to accommodate I.M. as an overnight student; as best as the court can tell from the record, however, Perkins was ready even by Plaintiffs' standards on September 30, 2010, when a bed for I.M. was set up and the residential Cottage was staffed. (A.R. at 137.) I.M. then began spending two nights a week at Perkins, although Plaintiffs continued to transport him back and forth on other days. (A.R. at 224.)

Given the roughly two-hour drive between Northampton and Perkins, I.M. was sometimes late for school, and this tardiness appears to have affected his progress and the delivery of certain services to him. (A.R. at 135.) For example, in a November progress report, Karen Brody, a speech language therapy teacher, noted that I.M. had attended "only three of his scheduled individual sessions" and "consistently misse[d]" his Thursday morning class. (A.R. at 228.) I.M.'s tardiness and absences also delayed the implementation of his communication device (the "ECO"), which the Perkins staff was reorganizing in an effort to make it more accessible to him. (Id.) In all, the record reveals that I.M. was present for 48 of 70 possible days

at Perkins from September through December and, in total, spent 17 of a possible 53 nights at the Cottage during this period. (A.R. at 135.)

On November 17, 2010, just days before the team meeting, Plaintiffs wrote to Hair to inform him that they would no longer be able to drive I.M. to and from Perkins; they explained, however, that this decision "does not reflect on Perkins staff, all of whom have shown great commitment and thoughtfulness throughout this process." (A.R. at 233.) Plaintiffs also stated that they would come to the team meeting but, until the BSEA reached a decision on their request for daily transportation (which request was still pending), they would not continue "assum[ing] responsibility" for such transportation. (Id.) One week later, Plaintiffs received the BSEA's November Ruling denying them reimbursement for daily transportation. (A.R. at 656.)

Approximately one month later, on December 29, 2010, Plaintiffs notified Ziegler that I.M. would not return to Perkins. (A.R. at 234.) In response, NPS, through counsel, contacted Plaintiffs' attorney on January 3, 2011, expressing concern that they had withdrawn I.M. from Perkins and giving notice that, if he did not return to school, NPS would file an emergency hearing request with the BSEA. (A.R. at 235.) I.M. did not return to Perkins and NPS, on January 13, 2011, requested a hearing. The BSEA's ruling thereon is the central focus of the present litigation.

D. *The BSEA Decision*

The BSEA hearing took place over three days in March and April of 2011 and included approximately seventeen hours of testimony and fifty-two joint exhibits. The issue addressed was whether the November 2010 IEP proposed by NPS and Perkins was reasonably calculated to provide I.M. with a free appropriate public edu-

cation in the least restrictive environment. The parties agreed that, if the hearing officer found that the IEP was not appropriate, she was to determine whether an alternate program in Holyoke proposed by I.M.'s parents would be an appropriate substitute.

In her decision of June 3, 2011, the BSEA hearing officer found that the November 2010 IEP was appropriate. (A.R. at 148–149.) The hearing officer concluded that the IEP "addressed all of [I.M.]'s identified needs and provided for appropriate services to meet those needs." (A.R. at 146.) She also noted that, the lack of daily transportation notwithstanding, Plaintiffs appeared to be satisfied with the services provided to I.M. by Perkins, citing several e-mails and progress reports in which Plaintiffs or their attorney gave positive assessments of his program. (Id.)

As for Plaintiffs' concern about whether I.M.'s was to be a five or seven day residential student, the hearing officer described this as "a bit of a red herring": "[t]he evidence shows that despite the fact that [Plaintiffs] accepted a residential placement, they did not intend for [I.M.] to be a residential student . . . [they] wanted [him] to live in their home with his family." (Id. at 147.) Similarly, the hearing officer found that it was "not necessary to resolve the issue of whether in fact Perkins was ready for [I.M.] to begin attending residentially at the beginning of September" because he "continued to be transported on most days even after the parties agreed that the Cottage was ready for [I.M.]'s safely residing there." (Id.)

The hearing officer also found that Kathleen Reilly, an assistive technology specialist who worked with I.M. and who testified for Plaintiffs as to the inadequacy of the IEP, did not have actual knowledge of the Perkins program. (Id. at 147.) Despite Reilly's familiarity with I.M. himself,

the hearing officer found that she had not observed him at Perkins and "had not spoken to any of his service providers at Perkins." (A.R. at 137.) With regard to Reilly's recommendations, the hearing officer explained, "it would be virtually impossible for any school, public or private, to follow all of the recommendations or provide the staff necessary to follow the recommendations." (Id.)

With regard to Plaintiffs' concerns that Perkins did not have I.M.'s ECO communication device operational—and that, as a result, he was unable to communicate as effectively as he had in the past—the hearing officer concluded that I.M.'s frequent absences from school were the main reason for the delay in its implementation. (Id. at 148.) The hearing officer found that "Perkins was not able to make revisions to [I.M.]'s ECO which they deemed necessary, because [he] missed all but three individual speech language sessions due to absences and tardiness," and that classroom switches associated with his communication device had not been set up for the same reason. (Id.)

As to whether the Holyoke program proposed by Plaintiffs would provide an appropriate education for I.M., an issue which she need not have addressed given the ruling on the IEP, the hearing officer concluded that Plaintiffs had not provided enough evidence or information for her to resolve the question in their favor. (A.R. at 148.) The only information Plaintiffs offered came from Hillary Jellison, a speech and language pathologist whose colleague consulted with Holyoke Public Schools, and from Plaintiffs themselves, who had spoken to the parents of other students who attended the school and who had received services from Jellison and her colleague. (Id.) No one from the Holyoke Public Schools testified. The hearing officer concluded that the Holyoke pro-

gram "currently does not exist and which may or may not exist next year." (Id.)

## III. DISCUSSION

The court will first address Plaintiffs' IDEA claim, namely their appeal of the BSEA decision, and then address their ADA claim.

### A. The IDEA

#### 1. Standard of Review

■ IDEA cases involve somewhat overlapping standards of review. *See N. Reading Sch. Comm. v. BSEA*, 480 F.Supp.2d 479, 481 n. 1 (D.Mass.2007) ("In a case like this, summary judgment is merely the device for deciding the issue, because the procedure is in substance an appeal from an administrative determination, not a summary judgment."). In appeals from administrative decisions made pursuant to the IDEA, "the burden rests with the complaining party"—here, Plaintiffs—"to prove that the agency's decision was wrong." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 991 (1st Cir.1990). The IDEA provides that, in actions involving such appeals, a federal district court:

(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C). Here, the court has received and reviewed the records of the administrative proceedings. In addition, the court denied Plaintiffs' motion to consider additional evidence for reasons stated in its April 26, 2012 order (858 F.Supp.2d 132 (D.Mass.2012)).

■ The IDEA's requirement that a reviewing court "base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); *Doe v. Attleboro Pub. Sch.*, 2011 WL 3854649, at *5 (D.Mass. Aug. 31, 2011). To the contrary, "[a]lthough the exact quantum of weight is subject to the district judge's exercise of informed discretion, the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1087 (1st Cir.1993) (citations omitted). Thus, the level of scrutiny applied to administrative decisions under the IDEA "requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review." *Id.* at 1086; *see also Lessard v. Wilton–Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 24 (1st Cir. 2008) ("judicial review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard"). The First Circuit has described this "intermediate level of review as 'one of involved oversight.'" *D.B.*, 675 F.3d at 36 (quoting *Lenn*, 998 F.2d at 1087).

#### 2. Plaintiffs' Claim

■ Plaintiffs argue that the hearing officer's finding, i.e., that I.M.'s 2010 IEP afforded him an appropriate education, was based on legal error. In support, Plaintiffs cite what they perceive to be several procedural and substantive deficiencies with the IEP. Having thoroughly reviewed the record and given due weight to the BSEA decision, however, the court finds that the IEP was reasonably calculated to provide I.M. with an appropriate

education for the 2010–2011 school year. The court's reasons follow.

### a. Alleged Procedural Violations

The complaint lists several examples of what Plaintiffs claim are procedural violations of the IDEA. Additional procedural violations were enumerated in Plaintiffs' briefs and yet others during the hearing on this matter before the court. In all, the procedural violations fall into essentially four categories, namely, NPS's failure (1) to timely convene team meetings, (2) to evaluate certain behavioral and diagnostic assessments prior to formulating the 2010 IEP, (3) to properly transition I.M. to Perkins and monitor his progress there, and (4) to implement accepted portions of the IEP. Unfortunately for Plaintiffs' cause, the preponderance of the evidence demonstrates otherwise.

First, Plaintiffs argue that certain statutorily required team meetings to update I.M.'s IEP were missed and, more specifically, that no team meetings took place from March 2009 through November 2010. Plaintiffs' argument, however, ignores what actually transpired during this time period. The March 2009 meeting established an IEP for the 2009–2010 school year, towards the end of which (at about the time another team meeting would have taken place) Plaintiffs unilaterally withdrew I.M. from NPS and began teaching him at home. (A.R. at 652.) At about the same time, Plaintiffs applied to Perkins and, shortly thereafter, accepted his residential placement there to begin in the fall of 2010.

It is clear from the record that Plaintiffs and NPS were in regular communication during this period and, together with Perkins, agreed that an IEP team meeting would be deferred until after I.M. spent some time at Perkins. (A.R. at 134.) As the hearing officer found, it was regular practice that "when a new student comes to Perkins, the staff accepts the IEP from the [school] district and works on those goals and objectives with the student and seeks to establish a baseline based on their own observation of his or her skills and abilities and . . . staff begins to write their own IEP." (A.R. at 135.) This finding is not only supported by the record but by Plaintiffs' counsel's representation at the BSEA hearing that the parties agreed to defer a team meeting until after I.M. began attending Perkins. (Tr. Vol. 1 at 37.)

Second, Plaintiffs maintain that certain assessments—specifically, the Neuropsychological Report and AT Assessment of July 2009, the Report of School Observations of January 2010, the Functional Behavioral Assessment of February 2010, and the 2010 Summer Camp Progress Report—were not considered by the IEP team at its November 2010 meeting. The hearing officer, in contrast, was not persuaded:

> The evidence shows that due to the ongoing litigation the Parties sometimes reviewed evaluations and recommendations during pre-hearing conferences and with the assistance of a BSEA hearing officer. There is no persuasive evidence that [NPS] ignored reports submitted by Parents.

(A.R. at 147.) The court agrees. For example, Kathryn Mahoney, the coordinator for I.M.'s IEP at NPS, testified that, although the reports were not discussed formally at the team meeting in November, they were read by members of the team and discussed at internal team meetings. (Tr. Vol. I at 67–70, 88–89.) I.M.'s mother herself testified that she provided the reports to the Perkins staff. (A.R. at 137.) There is also evidence that the Perkins team reviewed the reports prior to the team meeting in November. (A.R. at 506; Tr. Vol. 1 at 202–203.)

Based on its own review, the court finds the hearing officer's findings well supported by the record. In short, as the hearing officer found, the fact that the reports' recommendations were not all incorporated in the IEP is not evidence that they were not considered. (*See* A.R. at 147.) Moreover, as the hearing officer explained, "the report marked J–38 contained so many detailed recommendations that it would be virtually impossible for any school, public or private, to follow all of the recommendations or provide the staff necessary to follow the recommendations." (A.R. at 147.)

Third, Plaintiffs' argument that NPS failed to properly transition I.M. to Perkins and to monitor his progress there is unpersuasive. I.M.'s placement at Perkins arose from Plaintiffs' initiative and they were well aware that the transition would not only entail numerous changes but would delay the IEP team meeting for several months. If anything, as the hearing officer found, the transition became a non-issue when Plaintiffs decided to continue to transport I.M. even after Perkins was ready for him to stay. (A.R. at 147.) And as Ziegler testified, Perkins did not contact NPS requesting assistance or additional services. (Tr. Vol. 1 at 114.) To be sure, it may well have been preferable for NPS to be more involved in I.M.'s transition; the record reflects, however, that Perkins and Plaintiffs were in frequent communication in anticipation of I.M.'s arrival. The record also supports the hearing officer's finding that, by the end of September, "all of [Plaintiffs'] concerns about the residential portion of [I.M.'s] program had been resolved." (A.R. at 147.)

Plaintiffs' claim that NPS failed to monitor I.M. once at Perkins is also belied by the record. NPS received progress reports from Perkins and exchanged emails directly with Hair. (A.R. at 217–226, 231, and 633.) It was, in fact, NPS that raised concerns after Plaintiffs withdrew I.M. from Perkins in December, a matter of weeks after the IEP was formulated, and it was NPS who initiated the action before the BSEA. (A.R. at 235.)

Plaintiffs' fourth procedural argument—that NPS failed to implement the accepted portions of I.M.'s IEP, most notably, the transportation component—requires little of the court's attention. Plaintiffs' argument—that the transportation component of the IEP was actually *accepted* by them and that NPS was, therefore, required to start transporting I.M. to and from Perkins on a daily basis—simply lacks merit. As the IEP itself indicates and as Plaintiffs' counsel acknowledged at the hearing, Plaintiffs specifically *rejected* the transportation component since they understood, properly, that it applied to vacation transportation only, not weekly or, for that matter, daily transportation. Plaintiffs' contradictory notions of which portions of the November IEP were accepted and/or rejected aside, it is also clear from the record that NPS implemented the agreed-upon portions of I.M.'s IEP during the brief period he was at Perkins.

### b. Alleged Substantive Violations

Despite a different label, Plaintiffs' claims of substantive violations of the IDEA overlap with the procedural violations discussed above. To the extent they can be distinguished, Plaintiffs' arguments reflect two themes: (1) the hearing officer erred in upholding the appropriateness of I.M.'s IEP given the "drastic reduction" in services from the 2009–2010 IEP, and (2) the hearing officer erred when finding that the IEP was appropriate, even though it outlined a five-day per week program and I.M. was to attend Perkins seven days per week. Having reviewed the record anew

and the hearing officer's decision, the court finds Plaintiffs' various arguments unpersuasive.

First, Plaintiffs argue that the service delivery grid, which outlines the amount of time allotted to the variety of educational services I.M. requires, was inappropriate given the reduction in services outlined in I.M.'s 2009–2010 IEP. Tied to this argument is Plaintiffs' objection to the format of the IEP, which did not specifically delineate the services I.M. would receive. With respect to these arguments, the hearing officer found that "[t]he Perkins program is extremely integrated. This results in the services delivery grid looking different from IEPs from public school programs ... There does not need to be so much consultation because of the experience of the staff in working in different modalities." (A.R. at 136.) The hearing officer continued: "[t]here is also a very low staff to student ratio which gives them a large amount of time to meet with parents, work on strategies, to make adaptive devices or communication pictures and symbols. There are a lot more services provided in the specialized program at Perkins, according to Mr. Hair, and there are things they can do that public districts cannot do." (Id.)

After its independent review, the court finds more than sufficient evidence in the record supportive of the hearing officer's findings. Hair was questioned extensively at the hearing by counsel for both sides, as well as the hearing officer herself. He testified as to how the Perkins program is uniquely designed to serve the needs of children with disabilities and, given the staff's level of experience and small class sizes, how services that have to be delivered separately in a public school setting are actually incorporated into Perkins' classes throughout the day. (A.R. at 136–137; Tr. Vol. 1 at 212–214.) The hearing

officer also noted that the IEP was a work in progress, as the parents understood, and would evolve over time. (A.R. at 136.) Given the substantially different environment for which the prior 2009–2010 IEP was created, it was, as the hearing officer found, reasonable and appropriate that the 2010 November IEP for the 2010–2011 school year represented a departure from the service delivery grid of its predecessor.

Plaintiffs' second argument—that NPS denied I.M. a FAPE when it approved residential placement at Perkins—is also best understood in context and is, in any event, unsupported by the record. While Plaintiffs accuse NPS of making a "unilateral decision to simply dump this highly complex nine year old boy at a residential school away from home for 78 days," this characterization not only ignores the genesis of his placement at Perkins—which, as indicated, arose out of *Plaintiffs'* request—but also the time and effort expended by all the parties seeking an acceptable IEP. More specifically, the record supports the hearing officer's conclusion that, after NPS acceded to I.M.'s placement at Perkins and, "despite the fact that Plaintiffs accepted a residential placement, they did not intend for [I.M.] to be a residential student" because of Perkins' distance from Northampton. (A.R. at 147.)

In this vein, the issues of transportation and residential placement are essentially one and the same. To that end, they were addressed in the November Ruling, which found that

the parties agreed that I.M. would attend the Perkins school as a residential student beginning in September of 2010. The Perkins school accepted, and according to Mr. Hair, was fully prepared for I.M. as a residential student. Northampton notified the Parents of the residential student transportation ar-

rangements prior to I.M.'s enrollment at Perkins. The Perkins School has never recommended that [I.M.] attend its program as a day student and did not accept him as a day student. There was never an agreement among the Parents, NPS, and Perkins that day programming at Perkins, with the associated commute, could provide I.M. with a FAPE."

(A.R. at 661.) As indicated, Plaintiffs never appealed the November ruling to this court.

Along the same lines, Plaintiffs' argument—that the hearing officer erred when she first concluded that I.M.'s IEP would provide a FAPE in the least restrictive environment but then noted that a FAPE could be implemented at a school closer to home—is without merit. When her decision is considered in context, the hearing officer *concluded* that NPS satisfied its duty to provide I.M. with a FAPE by agreeing to Plaintiffs' request to place him at Perkins. The hearing officer then *commented* that, based on Plaintiffs'—unfortunately, conflicting—desire for I.M. to live with them at home, "the Parties are encouraged to attempt to locate a placement that can implement [I.M.'s] appropriate IEP in a location which allows [him] to continue to live with his family." (A.R. at 148.) In short, the hearing officer merely suggested that the parties continue to work together to devise an equally appropriate IEP closer to home. This comment was obviously aspirational; it did not, however, contradict the hearing officer's prior conclusion that the November 2010 IEP provided I.M. with a FAPE.

In sum, the court finds that Plaintiffs failed to meet their burden of demonstrating that the BSEA erred in finding that I.M.'s November 2010 IEP would provide him with a FAPE. The hearing officer's decision is well supported by the record and, having given it "due weight," the court agrees that NPS complied with both the procedural and substantive requirements of the IDEA and that the IEP was "reasonably calculated to enable [I.M.] to receive educational benefits." *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034.

### B. *American with Disabilities Act*

Taking a different tack, Plaintiffs allege in Count One that NPS violated the ADA, which prohibits state and local governments from discriminating against a disabled person on the basis of his or her disability. *See* 42 U.S.C. § 12132. Specifically, Plaintiffs assert that NPS violated an ADA regulation that requires public entities to "furnish appropriate auxiliary aids and services" to enable disabled individuals to participate in any services or programs offered by that entity. *See* 28 C.F.R. § 35.160.[1] NPS violated the regulation in March of 2009, Plaintiffs argue, when it altered I.M.'s speech and language services, thereby inhibiting his ability to communicate. In response, NPS argues that Plaintiffs' ADA claim is actually an IDEA claim dressed in different clothes and, as such, it should be dismissed because Plaintiffs have not exhausted the

---

1. The full text of the regulation is as follows:
   (a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.
   (b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.
   (2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities. 28 C.F.R. § 35.160.

IDEA's administrative remedies. In turn, Plaintiffs insist that their ADA claim is independent from the IDEA and, therefore, exempt from its exhaustion requirements.

As explained below, the court will find, first, that Plaintiffs' ADA claim is not wholly independent from the IDEA but, in essence, best described as alleging a discriminatory denial of a FAPE; as such, Count One must be dismissed because Plaintiffs have failed to abide by the IDEA's exhaustion requirement. As to certain other aspects of Count One, the court will conclude that no ADA violation occurred because NPS did not deny I.M. a FAPE. Finally, the court will find that, even if Plaintiffs' ADA claim has some independent vitality, it must be dismissed in light of the complete absence of any allegation or evidence of a discriminatory animus on the part of NPS.

### 1. Standard of Review

To survive a motion to dismiss, a complaint generally requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R.CIV.P. 8(a)(2). Nonetheless, a plaintiff still must allege enough facts so that the claim is "plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), *i.e.*, the factual content pled should "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). In drawing such an inference, the court need not credit "bald assertions, unsupportable conclusions, and opprobrious epithets." *Campagna v. Mass. Dep't of Envtl. Prot.*, 334 F.3d 150, 155 (1st Cir.2003) (quoting *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989)).

### 2. Exhaustion

Although involving several time periods, Plaintiffs' ADA claim can most accurately be divided into two, namely March 2009 to March 2010 and August 2010 to December 2010. The first time period implicates events that transpired outside the time frame of the BSEA decision presently before the court. The second, for all intents and purposes, runs simultaneously with that of the BSEA decision.

To be sure, Plaintiffs do not make this temporal distinction. Instead, in an effort to divorce the ADA claim from the IDEA exhaustion requirement, Plaintiffs assert that the ADA regulation on which Count One is based should be assessed only in light of the legal standards imposed by the ADA, not as a discriminatory denial of a FAPE. Viewed in this light, Plaintiffs argue, their ADA claim is properly before the court as a stand-alone claim exempt from the IDEA's exhaustion requirements.

Plaintiffs' present efforts to the contrary, their complaint makes clear that the entirety of their ADA claim stems from a disagreement about the communication services provided to I.M. by NPS through his IEP. For example, with regard to claims arising out of events during the first time period described above, the complaint states that "in March, 2009, NPS, without parental consent and over parental objection, significantly altered I.M.'s speech and language services." (Comp. ¶ 23.) The complaint goes on to state that "NPS intentionally discriminated against I.M. when it failed to provide him with appropriate auxiliary aids and services necessary to afford I.M. the ability to participate in, and enjoy the benefits of, Northampton's services ... in an equally effective and equally integrated manner as his peers." (Comp. ¶ 24.) As to the second time period, the complaint alleges that

"[f]rom September through December, 2010, NPS failed to take appropriate steps to ensure that I.M. would be able to communicate effectively and within natural contexts and failed to give primary consideration to the requests of I.M.'s parents related to the use of his communication device." (Compl. ¶ 26.) As is obvious, these assertions—all of which center on the appropriateness of the speech and language services provided to I.M. and the manner in which they were delivered—are, at their core, claims that the IEPs created by NPS were not appropriate. In short, Plaintiffs' ADA claims are inseparable from, not independent of, an IDEA claim.

■■■ To be sure, nothing in the IDEA bars Plaintiffs from pursuing independent claims under the ADA, even if such claims "invoke either the substance or the implementation of" the IDEA. *D.B.*, 675 F.3d at 40. Thus, Plaintiffs "are not otherwise barred from bringing a non-IDEA claim alongside an IDEA claim, even if there is some overlap between the two claims." *Id.* at 38. Plaintiffs, however, "cannot disguise an IDEA claim in other garb 'where the essence of the claim is one stated under the IDEA for denial of FAPE.'" *Id.* (quoting *Diaz–Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir.2006)). Equally clear is the directive that, when the underlying ADA claim is read most accurately as a denial of FAPE, the exhaustion requirements of the IDEA remain a necessary precursor to any action in federal court. *See Diaz–Fonseca*, 451 F.3d at 29 ("We hold that where the underlying claim is one of violation of the IDEA, plaintiffs

may not use § 1983–or any other federal statute for that matter—in an attempt to evade the limited remedial structure of the IDEA."). Such action must be brought within 90 days of a final administrative decision. 20 U.S.C. § 1415(i)(2)(B).[2]

■■■ As the First Circuit has explained, Section 1415(i) of the IDEA "requires that before suing under other federal statutes for relief also available under IDEA, 'the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required [in an IDEA suit].' Those subsections," the court continued, "provide for local and state-level administrative hearings." *Nieves–Marquez v. Comm. of Puerto Rico*, 353 F.3d 108, 118 (1st Cir.2003). Here, to the extent Plaintiffs' ADA claim is based on the time period from March 2009 to March 2010, which falls outside the time-frame of the IDEA claim presently before the court, Plaintiffs' conceded failure to exhaust their administrative remedies with regard to the ADA-grounded claim and/or appeal such a decision within 90 days is fatal to its present viability.

■■■ As for the ADA claim arising out of the second time period, August to December 2010, which runs concurrently with the time period of the BSEA decision presently before the court, that claim may coexist with claims brought under the IDEA to the extent it is based only on "rights and remedies that were already independently available through other sources of law." *Diaz–Fonseca*, 451 F.3d at 29. That is what Plaintiffs profess to be

---

2. Even were the court to agree that the remedy Plaintiffs seek for their ADA claim is not available under the IDEA, the First Circuit nonetheless instructs that "[e]xhaustion is beneficial regardless of whether the administrative process offers the specific form of remediation sought by a particular plaintiff." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 61 (1st.Cir.2002). This is so, the First Circuit explains, because "the administrative process facilitates the compilation of a fully developed record" and because it "ensure[s] that educational agencies will have an opportunity to correct shortcomings in a disabled student's IEP." *Id.*

the situation here. That assertion, however, is a reinvention of the facts revealed by the record. As described, the delivery of communication services to I.M. and the availability of his communication device are issues inextricably intertwined with the appropriateness of his IEP. Thus, at best, Plaintiffs' ADA claim is most appropriately characterized not as a stand-alone claim but as an ADA claim for the discriminatory denial of a FAPE. In such instances, a plaintiff must first prove that the disabled student was denied a FAPE and then "make an additional showing that the denial resulted from a disability-based animus." *D.B.*, 675 F.3d at 40. Here, as indicated, Plaintiffs have not been able to overcome the first hurdle, the court having concluded, as had the hearing officer, that I.M. had not been denied a FAPE. That being so, Plaintiffs' ADA claim necessarily fails.

### 3. Discriminatory Animus

Even if the court were to treat Plaintiffs' ADA claim as fully independent, it still falls of its own weight. In reaching this conclusion, the court here has considered, in addition to the complaint, the BSEA decision attached thereto. While a court is normally confined to the four corners of a complaint when addressing a motion to dismiss, it may consider a document outside the pleadings when the complaint's factual allegations are linked to and rely on that document. *See Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir.1998).

Here, nowhere in their complaint or briefs did, or can, Plaintiffs cite any evidence supporting a claim that NPS "intentionally discriminated against I.M.," making that claim no more than a "bald assertion" upon which their complaint may not rest. *Campagna*, 334 F.3d at 155. If anything, the BSEA decision documents the deliberate and extensive efforts to develop an appropriate education plan for I.M. by all involved, including NPS. Although the parties were unable to agree on particular aspects of his IEPs, it is clear that their failure to do so was not grounded in any discriminatory animus on the part of NPS. Simply put, there is no specific allegation to that effect and the record is entirely devoid of any such evidence, whether direct or circumstantial. Accordingly, even absent a determination that I.M. was provided a free appropriate public education, Plaintiffs' ADA claim fails.

### IV. CONCLUSION

The court acknowledges the significant effort undertaken by Plaintiffs to ensure that I.M., who is significantly compromised medically, obtains beneficial educational services. This is not an easy task although, as far as the court understands, Plaintiffs' most recent efforts have led to an agreement with NPS concerning their son's current placement. As the hearing officer concluded and as the court independently affirms, however, NPS appropriately addressed the issue of I.M.'s educational services in the November 2010 IEP within the confines of and pursuant to applicable legal standards. The court has also determined that Plaintiffs' ADA claim must be dismissed. For the reasons stated, therefore, Plaintiffs' motion for summary judgment is DENIED and NPS's motions to dismiss and for summary judgment are ALLOWED. As a result, judgment shall enter in favor of the BSEA as well.

IT IS SO ORDERED.